[Cite as *Galloway v. Galloway*, 2023-Ohio-29.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

| | |
|---|---|
| Jennifer L. Galloway | Court of Appeals No. E-21-043 |
| Appellant | Trial Court No. 2020 DR 0004 |
| v. | |
| Kyle L. Galloway | **DECISION AND JUDGMENT** |
| Appellee | Decided: January 6, 2023 |

* * * * *

Leslie O. Murray, for appellant.

Gina M. McNea, for appellee.

* * * * *

**MAYLE, J.**

{¶ 1} Plaintiff-appellant, Jennifer L. Galloway, appeals the October 1, 2021 judgment of the Erie County Court of Common Pleas, Domestic Relations Division, granting her a divorce from defendant-appellee, Kyle L. Galloway, and entering orders relating to spousal support and the division of marital assets. For the following reasons, we affirm, in part, and reverse, in part, the trial court judgment.

## I.      Background

**{¶ 2}** Jennifer Galloway and Kyle Galloway married on October 20, 1990.  On January 8, 2020, Jennifer filed a complaint for divorce; Kyle counterclaimed.  The matter proceeded to trial on October 6, 2020, after the parties could not agree on spousal support and the division and value of certain property.  The magistrate issued findings of fact and conclusions of law, and Jennifer filed objections.  In a judgment journalized on October 1, 2021, the trial court implicitly overruled Jennifer's objections and adopted the magistrate's findings of fact and conclusions of law.  Jennifer appealed and assigns seven errors for our review:

> FIRST ASSIGNMENT OF ERROR:  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT IGNORED RELEVANT EVIDENCE OF THE VALUE OF THE MARITAL RESIDENCE LOCATED AT 6903 PORTLAND ROAD, SANDUSKY, OH 44870.

> SECOND ASSIGNMENT OF ERROR:  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT IGNORED ESTABLISHED LAW THAT A MERE SIGNATURE ON A DOCUMENT DOES NOT CONSTITUTE A RELEASE OF DOWER RIGHTS.

> THIRD ASSIGNMENT OF ERROR:  THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT HELD, DESPITE TOTAL LACK OF EVIDENCE, THAT THE PARCELS LOCATED AT 1812 STATE

2.

ROUTE 13, GREENWICH, OH 44837 WERE SEPARATE PROPERTY OF THE APPELLEE.

FOURTH ASSIGNMENT OF ERROR: THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO APPLY THE RELEVANT FACTORS OF O.R.C. 3105.18 AND DID NOT AWARD THE APPELLANT WITH SPOUSAL SUPPORT.

FIFTH ASSIGNMENT OF ERROR: THE TRIAL COURT INCORRECTLY QUALIFIED A PORTION OF THE HELOC DEBT AS PERSONAL, WHEN IT WAS ACQUIRED PRIOR TO THE PARTIES['] SEPARATION, AND IS THEREFORE MARITAL DEBT.

SIXTH ASSIGNMENT OF ERROR: THE TRIAL COURT IMPOSED AN UNJUST AND INEQUITABLE DIVISION OF THE PARTIES' ACCOUNTS AND PERSONAL PROPERTY.

SEVENTH ASSIGNMENT OF ERROR: THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO RETURN APPELLANT TO HER FORMER MAIDEN NAME.

## II.    Law and Analysis

{¶ 3} Jennifer's seven assignments of error challenge several aspects of the trial court's judgment entry of divorce, including (1) its rejection of her expert's opinion concerning the value of the marital residence; (2) its rejection of her claim that she did

not intend to release her dower rights as to real property Kyle sold to his father; (3) its conclusion that real property gifted to Kyle by his parents was his separate property; (4) its refusal to award spousal support to Jennifer; (5) its allocation of $15,000 as debt attributable to only Jennifer; (6) its valuation and division of certain marital assets; and (7) its failure to restore Jennifer to her maiden name.

{¶ 4} We address each of Jennifer's assignments of error in turn.

## A. Opinions Concerning the Value of the Marital Residence

{¶ 5} Jennifer and Kyle both presented expert testimony concerning the value of the marital home. Jennifer presented the testimony of Christopher Wechter, a broker, who provided a broker price opinion in October of 2020, and estimated the value of the home at $375,000.00. Kyle presented the testimony of Donald Leto, an appraiser, who appraised the property as of October 22, 2019, and who estimated the value at $280,000. Jennifer claims that the trial court abused its discretion in rejecting her expert's opinion concerning the home's value.

{¶ 6} Jennifer argues that (1) the value of the home greatly increased between the time Leto appraised it in October of 2019, and Wechter valued it in October of 2020; (2) Leto failed to consider features that increased the value of the property including trees and woods, a building, the school district, proximity to shopping, and updates Kyle made to the house after the appraisal; and (3) Leto valued the home against comparables that were located outside the school district and further away from shopping and industry

4.

instead of comparing it against comparables in the vicinity of the home. Jennifer insists that Wechter provided a line-by-line explanation of items missing from Leto's appraisal and fully explained the deficiencies in Leto's appraisal, but the trial court failed to consider Wechter's opinions and incorrectly adopted Leto's valuation.

{¶ 7} Kyle responds that Leto inspected both the interior and exterior of the home, while Wechter viewed only the exterior. He claims that several factors affected Leto's valuation, including the fact that (1) the home is heated by wood only; (2) the home has no air conditioning; (3) the home has no water source—water must be hauled to the property; (4) the home had previously been used as a pole barn and was converted into a house; and (5) the home has no basement. Kyle emphasizes that Wechter acknowledged that he was unaware that the home had previously been used as a pole barn, a factor that could affect its value, and Wechter valued a barn on the property at $100,000 even though he never went into it. He points out that Leto explained that the higher-value comparables Wechter used to value the home had important differences, including the quality of the exterior construction and interior finishes, heat and air conditioning, square footage, and the existence of basements.

{¶ 8} The valuation of marital assets is typically an issue of fact for the trial court. *Ruetz v. Ruetz,* 6th Dist. Lucas No. L-02-1037, 2003-Ohio-4091, ¶ 41, citing *Hacker v. Hacker*, 5 Ohio App.3d 46, 47, 448 N.E.2d 831 (5th Dist.1981). In determining a value, the trial court is charged with weighing the evidence and determining the credibility of

the witnesses. *Wideman v. Wideman*, 6th Dist. Wood No. WD-02-030, 2003-Ohio-1858, ¶ 21. It may "accept or reject either party's opinion as to the value of the marital home, so long as its decision is support by evidence in the record." *Id.,* citing *Murray v. Marina, Inc. v. Erie Cty. Bd. of Revision*, 123 Ohio App.3d 166, 173, 703 N.E.2d 846 (6th Dist.1997). To that end, we review a trial court's valuation of marital property using the manifest-weight-of-the-evidence standard. *Jackson v. Jackson*, 6th Dist. Fulton No. F-12-013, 2014-Ohio-1145, ¶ 17, citing *Schuller v. Schuller,* 6th Dist. Fulton No. F-96-012, 1997 WL 51223, * 2 (Feb. 7, 1997). This means that we will affirm the trial court's valuation determination if it is supported by competent and credible testimony. *Smith v. Smith,* 6th Dist. Sandusky No. S-89-3, 1990 WL 1357, *6 (Jan. 12, 1990).

{¶ 9} Here, Wechter's valuation was performed more recently than Leto's, however, Leto testified that the average sales prices had not changed since the time he performed the appraisal—it had just become easier to sell houses. More importantly, the trial court judgment specifically observed that Leto inspected both the exterior *and* interior of the house, while Wechter performed a drive-by inspection of only the *exterior*. This was clearly important to the trial court's decision. The trial court was free to make credibility determinations and weigh the evidence as it deemed appropriate. This means it was free to reject Jennifer's expert's opinion concerning the value of the home. *See, e.g., Anderson v. Anderson*, 147 Ohio App.3d 513, 526, 771 N.E.2d 303 (7th Dist.2002)

6.

("The court did not give much weight to the appraisal submitted by Garner because it appeared that he did not actually visit the site.").

{¶ 10} Accordingly, we find that the court's decision declining to accept Jennifer's expert's valuation was supported by competent, credible evidence. We find Jennifer's first assignment of error not well-taken.

## B. Release of Dower Rights

{¶ 11} In January of 2014, Kyle sold ten acres of property—acquired during the marriage, but titled only to him—to his father, Dennis Galloway, for $36,000. In connection with that transfer of property, Jennifer signed a quitclaim deed, releasing her dower rights. The trial court concluded that the divorce proceedings were not the proper forum—and it refused—to "unravel" this transaction that had occurred six years earlier. It noted that Jennifer had benefitted from receipt of the proceeds of that sale. In her second assignment of error, Jennifer challenges the trial court's conclusion. She claims that her signature on that document did not effectively release her dower rights because she was misled into signing and did not intend to convey the property.

{¶ 12} Jennifer argues that under Ohio case law, when a party to a marriage does not understand what "dower rights" means and believes that a document is being signed for the tax benefit of the marriage, the mere signature on the document signing away dower rights is not enough to accomplish release of those rights. She claims that she was asked to sign the deed to reach a beneficial tax result—not to convey property—and she

7.

relied on Kyle to act in her best interest. Jennifer maintains that the ownership of that property was an essential part of the marital estate and part of the parties' retirement plan. She insists that while Dennis bought the property, he holds it in trust and intends for it to revert to Kyle when Dennis dies. Jennifer contends that Kyle should not be gifted property that was supposed to be a marital asset.

{¶ 13} Kyle responds that (1) Jennifer has failed to meet her burden of demonstrating a lack of intent to transfer the property; (2) the sale of this property occurred six years before the trial of the divorce, yet Jennifer is only now complaining; (3) Kyle and Jennifer had originally bought 60 acres and at the time of the 2014 transaction, they had "systematically sold" all but ten to 12 acres of it, so Jennifer would have executed similar deeds for the other transfers; (4) proceeds from the sale were used to pay down the mortgage on the marital home, pay marital bills, and make payment towards the home of the parties' daughter in Cincinnati, thus Jennifer benefitted from the proceeds of that sale; and (5) Jennifer executed the deed in front of an attorney—Kyle's uncle—and she could have asked what dower rights were.

{¶ 14} Jennifer relies on *Partridge v. Partridge*, 2d Dist. Greene No. 98 CA 38, 1999 WL 945046, *9 (Aug. 27, 1999), in support of her position that her signature on the warranty deed transferring the ten acres to Dennis did not effectively release her dower rights because she signed that deed for "tax reasons" and not because she intended to release her dower rights. In *Partridge,* the husband obtained a bank loan for the marital

8.

residence acquired during the course of the marriage, but given wife's poor credit history, the bank advised that he would not be approved for the loan if wife were on the mortgage. Accordingly, wife signed a document releasing her dower rights so that the mortgage could be obtained.

{¶ 15} The Second District Court of Appeals explained that the burden of challenging the effectiveness of a deed executed in accordance with statutory requirements rests with the person making the challenge. *Id.*, citing *Pettry v. Pettry*, 81 Ohio App.3d 30, 34, 610 N.E.2d 443 (10th Dist.1991). He or she must "demonstrate that the deed was not intended as an outright complete transfer of all of [his or her] interest in the property" to his or her spouse despite the express terms of the deed. *Id.*, quoting *id.*

{¶ 16} In *Partridge,* the court found that there had been ample evidence presented that the house was purchased as marital property and remained marital property. It concluded that husband failed to demonstrate that wife intended to transfer to him outright her interest in the property or to convey her interest in the residence to him as separate property. To the contrary, the evidence at trial showed that wife left all financial decisions to husband, her name was not on the mortgage because of her credit problems, she did not know what "dower rights" meant, she was not aware of signing away any quitclaim of dower rights, and it was not her intent to release her dower rights. The court held that the marital residence was properly determined to be marital property subject to division.

9.

**{¶ 17}** Kyle responds that *Partridge* is distinguishable because the court was determining the division of the equity of the divorcing parties' marital home and there was never a signing of any document for the release. He emphasizes that *Partridge* makes clear that the burden rests with the person challenging the effectiveness of the deed.

**{¶ 18}** We agree with Kyle that *Partridge* is of no assistance here. The court in *Partridge* was charged with dividing the parties' interests in the marital home, where the parties had resided together until they separated and where husband continued to reside. The property at issue *here* involved approximately ten acres of investment property that was part of a larger, 60-acre parcel, the majority of which the parties had sold to third-party purchasers. This ten-acre parcel was sold to Dennis *six years* before the divorce—long before divorce was even being contemplated—for $36,000, and the proceeds were used for the benefit of both Kyle and Jennifer. They used the proceeds to pay down their own mortgage—increasing their equity—pay the mortgage on their daughter's home (which Kyle and Jennifer owned together), and pay household expenses. Both parties benefitted.

**{¶ 19}** Jennifer has failed to meet her burden of demonstrating that her signature on the deed was not intended as an outright, complete transfer of all of her interest in the property. We find no abuse of discretion in the trial court's refusal to "unravel" this 2014

10.

transaction. Its decision is supported by competent, credible evidence. We find Jennifer's second assignment of error not well-taken.

## C. Determination of Separate Property

{¶ 20} In 2014, Kyle's parents transferred two parcels of land to Kyle, located in Greenwich, Ohio. It is deeded in only Kyle's name. Jennifer argued that because this land was acquired by Kyle during his marriage to her, it must be treated as marital property unless there is clear and convincing evidence that it was intended as a gift solely to one party to the marriage. The trial court determined that it had been gifted only to Kyle and constitutes his separate property. In her third assignment of error, Jennifer argues that this was error.

{¶ 21} In divorce proceedings, the domestic relations court must determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B). "This determination involves mixed questions of law and fact, and is therefore not a discretionary matter." (Citations omitted.) *Dayal v. Lakshmipathy*, 2020-Ohio-5441, 163 N.E.3d 683, ¶ 26 (6th Dist.), *appeal not allowed,* 161 Ohio St.3d 1475, 2021-Ohio-717, 164 N.E.3d 480. "We review the domestic relations court's characterization of property under the manifest weight of the evidence standard." *Id.* We will not reverse a judgment as against the manifest weight of the evidence if it is supported by some competent, credible evidence. *Blake Homes, Ltd. v. FirstEnergy Corp.,* 173 Ohio App.3d 230, 2007-

11.

Ohio-4606, 877 N.E.2d 1041, ¶ 62 (6th Dist.), citing *C.E. Morris Co. v. Foley Constr. Co.* , 54 Ohio St.2d 279, 280, 376 N.E.2d 578 (1978).

{¶ 22} R.C. 3105.171(A)(2)(a)(i) defines "marital property" to include "[a]ll real and personal property that currently is owned by either or both of the spouses * * * and that was acquired by either or both of the spouses during the marriage * * *." R.C. 3105.171(A)(6)(a)(vii) defines "separate property" to include "[a]ny gift of any real or personal property * * * that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse." Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

It is generally presumed that property acquired during a marriage is "marital property" unless it can be shown to be separate. *Daval* at ¶ 28, citing *Johnson v. Mills*, 8th Dist. Cuyahoga No. 102241, 2015-Ohio-4273, 18. The burden of demonstrating that property is separate property lies with the party seeking such classification. *Id.,* citing *Tincher v. Tincher*, 5th Dist. Fairfield No. 2019 CA 00028, 2020-Ohio-3352, ¶ 64, citing *Passyalia v. Moneir*, 2017-Ohio-7033, 95 N.E.3d 723, ¶ 18 (5th Dist.).

12.

{¶ 23} It is undisputed that the property in Greenwich is titled in only Kyle's name. Kyle argues that it was intended to be separate property because (1) his parents had a practice of gifting real estate to Kyle and his siblings; (2) Kyle used the land for hunting and offered to buy the land from his parents, but they preferred to gift him the property; (3) Dennis sought legal advice on how best to transfer the property and, in a letter from his attorney, repeated reference is made to gifting the property *to Kyle*— Jennifer is not mentioned in the letter.

{¶ 24} Jennifer responds that the letter from counsel does not suggest that she was intended to be excluded from the gift. She claims that it was her in-laws' practice to write annual Christmas checks to Kyle that were "always seen as a gift to both of them."

{¶ 25} Unlike some of the other properties acquired during the marriage, the property in Greenwich was deeded only to Kyle. At trial, Dennis testified that he intended the land as a gift to Kyle, just as he had gifted houses to both of his daughters. The letter from Dennis's attorney references Dennis's intent to gift the property to Kyle—it never mentions Jennifer.

{¶ 26} Jennifer testified that marital funds were used to build a cabin on the property, but Dennis testified that he built the cabin with the help of his friend Bill, and Kyle helped him (to the extent he was able, due to back problems), just as Dennis had helped Kyle build his house. Dennis acknowledged that Kyle and Jennifer paid to run electricity to the cabin, however, Kyle testified that other than installing electric for

13.

$5,600, he had put no money into the cabin and had used only salvaged materials. His sister recently gave him her old kitchen cabinets to put in the cabin, but the cabin has no running water or useable indoor bathroom. Jennifer testified that when their adult children were little, they used to go camping on the property, however, she did not specify whether that was before or after Dennis transferred the property to Kyle. She acknowledged that Kyle mainly used the property for hunting.

{¶ 27} We find that this evidence was sufficient for the trial court to form a firm belief or conviction that the property in Greenwich was gifted only to Kyle and constituted separate property. There is competent, credible evidence in the record to support that conclusion. We find Jennifer's third assignment of error not well-taken.

### D. Spousal Support

{¶ 28} In her fourth assignment of error, Jennifer argues that the trial court erred in failing to award her spousal support. R.C. 3105.18(B) provides that "[i]n divorce and legal separation proceedings, upon the request of either party and after the court determines the division or disbursement of property under section 3105.171 of the Revised Code, the court of common pleas may award reasonable spousal support to either party." R.C. 3105.18(C)(1) sets forth the factors that must be considered "in determining whether spousal support is appropriate and reasonable, and in determining the nature, amount, and terms of payment, and duration of spousal support." Those factors are:

14.

(a) The income of the parties, from all sources, including, but not limited to, income derived from property divided, disbursed, or distributed under section 3105.171 of the Revised Code;

(b) The relative earning abilities of the parties;

(c) The ages and the physical, mental, and emotional conditions of the parties;

(d) The retirement benefits of the parties;

(e) The duration of the marriage;

(f) The extent to which it would be inappropriate for a party, because that party will be custodian of a minor child of the marriage, to seek employment outside the home;

(g) The standard of living of the parties established during the marriage;

(h) The relative extent of education of the parties;

(i) The relative assets and liabilities of the parties, including but not limited to any court-ordered payments by the parties;

(j) The contribution of each party to the education, training, or earning ability of the other party, including, but not limited to, any party's contribution to the acquisition of a professional degree of the other party;

(k) The time and expense necessary for the spouse who is seeking spousal support to acquire education, training, or job experience so that the spouse will be qualified to obtain appropriate employment, provided the education, training, or job experience, and employment is, in fact, sought;

(l) The tax consequences, for each party, of an award of spousal support;

(m) The lost income production capacity of either party that resulted from that party's marital responsibilities;

(n) Any other factor that the court expressly finds to be relevant and equitable.

{¶ 29} While the trial court is required to consider each of these statutory factors, it need not comment on each of them; "rather, the record must only show that the court considered the statutory factors when making its award." *Choi v. Choi*, 2018-Ohio-725, 106 N.E.3d 908, ¶ 9 (9th Dist.). An award of spousal support is generally within the trial court's discretion and will not be disturbed absent an abuse of that discretion. *Newcomer v. Newcomer*, 6th Dist. Lucas No. L-11-1183, 2013-Ohio-5627, ¶ 22. An abuse of discretion connotes that the trial court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). An unreasonable decision is one that lacks sound reasoning to support the decision. *Hageman v. Bryan City Schools*, 10th Dist. Franklin No. 17AP-742, 2019-

16.

Ohio-223, ¶ 13. "An arbitrary decision is one that lacks adequate determining principle and is not governed by any fixed rules or standard." *Id.* quoting *Porter, Wright, Morris & Arthur, LLP v. Frutta del Mondo, Ltd.*, 10th Dist. Franklin No. 08AP-69, 2008-Ohio-3567, 2008 WL 2779511, ¶ 11. And an unconscionable decision is one "that affronts the sense of justice, decency, or reasonableness." *Id.*

{¶ 30} We review the parties' arguments and the trial court's findings with respect to the R.C. 3105.18(C)(1) factors.

### 1. Parties' Income and Relative Earning Abilities

{¶ 31} Kyle's 2019 W-2 wages exceeded Jennifer's by approximately $20,000. Jennifer claims, however, that Kyle is highly skilled in performing residential home improvement projects and over the years has relied on these skills to supplement his income from his full-time job at NASA. She estimates that with these "side jobs" that he performs, Kyle's total annual income is closer to $40,000 more than hers. Jennifer insists that despite his claims to the contrary, Kyle continues to perform residential home improvement projects for which he is paid, and the trial court abused its discretion in accepting his testimony that he no longer performs these projects.

{¶ 32} Kyle responds that he and Jennifer's incomes are close. He maintains that Jennifer presented no evidence of his income from side jobs and the only examples of side jobs that she could point to were projects he completed years ago for family

17.

members and close friends.  Kyle testified that he stopped performing side jobs because of the physical strain on his body.

{¶ 33} The trial court found that both Jennifer and Kyle have stable employment with future income growth potential.  It recognized that Kyle earned $11,642.37 more than Jennifer.  It found that Jennifer failed to establish any additional income attributable to Kyle for side jobs.  It found no evidence to support her contention that Kyle earned $20,000 per year from side jobs.

### 2. The Parties' Ages and Physical, Mental, and Emotional Conditions

{¶ 34} The parties are both in their early 50s.  Jennifer concedes that Kyle has had some back issues over the years, but claims they are both in good health now.  There was testimony that Kyle was unable to work for a period of time because of back issues.  He also testified that he got out of the construction business (which was his occupation from 2000 until he began working for NASA in 2017) because he was worn out and was experiencing knee, shoulder, and back problems.  But Kyle agrees that both parties are relatively young and healthy and still in their working years.

{¶ 35} The trial court found that both parties are relatively young and in good health.

18.

### 3. The Parties' Retirement Benefits

{¶ 36} Jennifer maintains that the parties' retirement benefits were equalized during the divorce process. Kyle responds that Jennifer glosses over the fact that his retained retirement assets were significantly less than hers.

{¶ 37} The trial court found that Jennifer's retirement benefits are nearly double Kyle's.

### 4. The Duration of the Marriage

{¶ 38} The parties were married for almost 30 years. Jennifer argues that the trial court discounted this fact in its decision denying spousal support. She claims that she organized her life around the parties' marriage and their eventual retirement together. She insists that she chose to take a lower-paying job to be on the same schedule as their children, depended on the parties' accumulation of property as a retirement source, and became accustomed to a certain standard of living that she is now being denied.

{¶ 39} The trial court found that the duration of the marriage was the only factor that favors an award of spousal support.

### 5. Consideration of Care of Minors

{¶ 40} The parties' children are now grown, however, Jennifer maintains that the parties decided together that she would take a lower-paying job so that she would have the same schedule as the children when they were school-aged. She insists that because

19.

of this decision, she makes less money than she may have, and at this point—after 22 years as a school secretary—she could not easily switch jobs.

### 6. The Parties' Standard of Living Established During the Marriage

{¶ 41} Jennifer argues that she is not able to maintain the same standard of living that was established during her marriage. Her condo is half the size of the home she shared with Kyle and a loan she took out in connection with the purchase of the condo went toward the actual purchase price and realtor fees and toward flooring, furniture, and appliances. She explains that she and Kyle used to take lavish vacations to places like Punta Cana. She acknowledges that she has taken three trips during the pendency of the divorce—one to Chicago, which her daughter paid for, so that Jennifer could care for her granddaughter while her daughter attended a work seminar; one to her sister's wedding; and one to the home of a friend, who allowed her to stay there for free. Meanwhile, she claims, Kyle's standard of living has not suffered. Finally, Jennifer maintains that while Kyle paints her out to have a history of imprudent spending, she explains that the parties used credit cards to pay household expenses, to entertain, and to pay for the expenses of their daughter's wedding.

{¶ 42} Kyle emphasizes that Jennifer received temporary spousal support while this case was pending, which allowed her to secure her own housing and adjust to life with her own income. He also points out that he gave her $145,000 so she could buy her $169,500 condo. He maintains that Jennifer chose to take out an additional $60,000 loan

20.

for upgrades, new furnishings, matching appliances, and the extras she desired, when the parties could have divided up their personal property and household furnishings. Kyle insists that Jennifer chose to incur these additional expenses, and instead of living within her means, racked up additional debt.

{¶ 43} The trial court found that Jennifer lives beyond her means and expects Kyle to pay for it.

### 7. The Parties' Relative Extent of Education

{¶ 44} Jennifer acknowledges that the parties are equally educated and close to retirement, and that it is unreasonable to expect either of them to change careers at this stage in life.

### 8. The Parties' Relative Assets and Liabilities

{¶ 45} Jennifer claims that Kyle has many assets—he owns properties and is the beneficiary of a family trust. He also has a fiancée who assists with food and furniture expenses, and his parents routinely gift him money or property.

{¶ 46} The trial court found that Kyle obtained a loan for $145,000 so that Jennifer could secure her own housing. It observed that Jennifer purchased a $169,500 condo with this $145,000—her share of the equity in the marital residence—but chose to borrow an additional $60,000 (instead of the $25,400 shortfall) for extras such as paint, furnishings, and appliances. It noted that Jennifer took only one couch and bedroom set from the marital home instead of utilizing items from the marital residence. It

21.

characterized Jennifer as having chosen to financially encumber herself unnecessarily.  It also emphasized that $35,000 had been used from a home equity line of credit to pay Jennifer's credit card debt, and despite the account being frozen, she took out an additional $15,000, which she used toward her attorney fees and a new car.  Finally, the court found that Jennifer had incurred another $10,000 in credit card debt.

## 9.  The Contribution of Each Party to the Other's Education or Training

{¶ 47} Jennifer argues that she took a lower-paying job so that she could be available to the parties' minor children and so that Kyle "could hone his skills in the construction industry."

## 10.  The Time and Expense Necessary to Acquire Additional Education or Training and the Tax Consequences of an Award of Spousal Support

{¶ 48} Jennifer concedes that these factors are inapplicable.

## 11.  Lost Income Production Capacity Resulting from Marital Responsibilities

{¶ 49} Jennifer claims that she and Kyle made the joint decision that she would quit her job at National City Bank—where she was being prepared to become a loan officer—so she could care for their children, then she took a job at their school so she could have the same schedule as the children.  She insists that she is now locked into a lower-paying job when she could be making significantly more money.

22.

### 12. Any Other Factor that the Court Expressly Finds Relevant and Equitable

**{¶ 50}** Jennifer argues that due to the parties' long-term marriage, Kyle's ability to make more money than Jennifer, and the parties' decision that Jennifer would maintain a lower-paying job to care for their children, and in order for Jennifer to maintain a similar standard of living post-divorce, she should be awarded spousal support. She insists that Kyle distracted the court by pointing out one-time expenses associated with moving to imply that Jennifer lives beyond her means. She complains that the trial court gave improper weight to personal perspective and value judgments and adopted Kyle's gender-based arguments (e.g., "a woman who has too many credit cards and gets her nails done too often"). She maintains that the trial court abused its discretion in not utilizing R.C. 3105.18(C)(1).

**{¶ 51}** Under R.C. 3105.18(C)(1), the trial court must determine whether spousal support is "appropriate and reasonable." *Morse v. Morse,* 6th Dist. Ottawa No. OT-16-023, 2017-Ohio-5690, ¶ 18, citing *Basista v. Basista*, 6th Dist. Wood No. WD-14-076, 2016-Ohio-146, ¶ 28. The factors enumerated in R.C. 3105.18(C)(1) guide the court in making this determination. *Id.* A trial court must not base its determination upon any one factor taken in isolation. *Organ v. Organ*, 2014-Ohio-3474, 17 N.E.3d 1192, ¶ 15 (9th Dist.), citing *Kaechele v. Kaechele,* 35 Ohio St.3d 93, 518 N.E.2d 1197 (1988), paragraph one of the syllabus. "[A]ll of the statutory factors must be considered, with the goal of reaching an equitable result." *Pearson v. Pearson*, 6th Dist. Wood No. WD-21-

23.

066, 2022-Ohio-642, ¶ 12, citing *King v. King*, 6th Dist. Erie No. E-17-072, 2019-Ohio-1561, ¶ 8-9.

{¶ 52} Here, our review of the trial court judgment confirms that the court thoroughly considered each of the relevant factors under R.C. 3105.18(C)(1), and applied those factors in light of the facts presented at trial. Certainly, the parties were married for a very long time—one factor weighing in favor of an award of spousal support. However, while Kyle earned more than Jennifer, the income disparity was not so significant as to afford one party a significantly more comfortable lifestyle than the other. Moreover, Jennifer exited the marriage with greater retirement assets and relatively little debt. Although Jennifer sought to impute additional income to Kyle, she did not present sufficient evidence of the income he earned from this additional work or the regularity of these side jobs. Finally, although Jennifer asserted that she made career decisions for her family that foreclosed the possibility of a higher-paying job, this argument was not well-developed. She testified simply that she was a secretary for a loan officer, that she was being prepped "to do loans," and that she "could have moved up the ladder" if she would have stayed at the bank.

{¶ 53} We find no abuse of discretion in the trial court's decision not to award spousal support here. We find Jennifer's fourth assignment of error not well-taken.

24.

## E. HELOC Debt

**{¶ 54}** In May of 2019, Jennifer and Kyle secured a $50,000 home equity line of credit ("HELOC"). The parties used $35,000 to pay down credit card debt then froze the account. Jennifer unfroze the account and withdrew the remaining $15,000 in August of 2019, to pay counsel fees and living expenses. The court found that Jennifer used $3,500 to pay attorney fees and $4,000 for her new car, and placed the remainder in her savings account. It, therefore, determined that this $15,000 was separate debt for which Jennifer was solely responsible. In her fifth assignment of error, Jennifer argues that this was error.

**{¶ 55}** Jennifer claims that she and Kyle did not separate until November of 2019, when she moved out of the marital residence, and the entirety of the loan was utilized before their separation. She emphasizes that most of the line of credit was used to pay credit card debt incurred by the parties during their marriage. She maintains that by allocating the $15,000 liability only to her, the trial court punished her for seeking the legal representation to which she was entitled. Jennifer insists that all $50,000 should be treated as marital debt.

**{¶ 56}** Kyle responds that until Jennifer unilaterally borrowed the $15,000 against the HELOC, all that was owed on the marital residence was the $35,000, which they used to pay down credit card debt. He insists that Jennifer used that $15,000 for attorney fees and personal expenses, including the purchase of a new vehicle, while the parties were in

25.

the process of disentangling themselves from one another.  As such, he claims, he "never saw a dime" of that money, and the trial court properly determined it to be separate debt attributable only to Jennifer.

{¶ 57} "The property to be divided in a divorce proceeding includes not only the assets owned by the parties, but also any debts incurred by the parties."  (Internal citations and quotations omitted.)  *Baum v. Perry-Baum,* 6th Dist. Wood No. WD-18-085, 2019-Ohio-3923, ¶ 22.  Where the amount of debt is undisputed and the issue is one of property division, the trial court is vested with broad discretion to divide that property as it deems equitable.  *Id.* at ¶ 23.  "An equitable distribution * * * does not always mean an equal distribution."  *Id.,* citing *Cherry v. Cherry*, 66 Ohio St.2d 348, 355, 421 N.E.2d 1293 (1981).

{¶ 58} This court has thoroughly considered the entire record of proceedings in the trial court and we find that the trial court's allocation of this $15,000 debt to Jennifer was not unreasonable, arbitrary or unconscionable, and, therefore, not an abuse of discretion.[1] We find Jennifer's fifth assignment of error not well-taken.

---

[1] Jennifer argues that the trial court abused its discretion in allocating the $15,000 debt to her.  Even applying a more stringent standard, we would still find no error in the trial court's allocation to Jennifer of the $15,000 HELOC debt.  The evidence at trial makes clear that Jennifer unilaterally withdrew that money and used it solely for her own benefit while the parties were in the process of seeking an end to their marriage, but while she was still living in the marital home.  Jennifer agreed on cross-examination that "Kyle didn't see that money."

26.

## F. Division of Accounts

**{¶ 59}** After valuing the marital residence, the court calculated its available equity by subtracting the $50,000 HELOC. Dividing that amount in two, it found that Jennifer and Kyle each had equity of $119,365. Kyle had already paid $145,000 to Jennifer so that she could buy a condominium. Thus, the court found that Jennifer had been overpaid by $25,635. After making this determination, the court valued and divided other of the parties' property and either credited it or debited it from Jennifer's overpayment. In her sixth assignment of error, Jennifer argues that the trial court erred by incorrectly valuing and inequitably dividing certain of the parties' accounts and personal property.

**{¶ 60}** Specifically, Jennifer takes issue with the following valuations:

- A 1994 Skid Steer and 2002 Bobcat. Jennifer claims that Kyle sold these items to a friend at a price ($4,000) well below market value, yet Kyle continues to have access to this equipment, essentially retaining its benefit;

- The Silverado. Jennifer claims that the court should not have accepted the Kelley Blue Book value—$9,108—for Kyle's 2007 Chevy Silverado because Kyle testified he would never sell it for that low an amount;

- Kyle's tools. Jennifer claims that the trial court ignored credible testimony that Kyle owns numerous tools (saws, air compressors, drills, a grinder, a weed whip, gas cans, mowers, a ladder, a socket set, a shop vac, a sawzall), which she testified are worth $20,000;

27.

- Kyle's guns. Jennifer claims that the court failed to account for the value of 13 of Kyle's guns, which Jennifer contends have a value of $2,600 (average of $200 per gun); and

- A 2006 Mule. Jennifer claims that the trial court failed to account for the value of a 2006 Mule that she says is worth $7,000.

{¶ 61} Jennifer also thinks the trial court should have recognized the following in its property distribution:

- Kyle owes Jennifer $17,500 for the marital residence;

- Jennifer owes Kyle $15,760 because her bank accounts plus retirement accounts total $88,660, and Kyle's retirement accounts plus a life insurance policy total only $72,900;

- Kyle owes half of Jennifer's credit card debt of $11,700;

- Kyle owes Jennifer $279,911 for her interest in real property;

- Kyle owes Jennifer half of the value of his "vehicle, personal property, guns, and tools," which she estimates at $87,900; and

- Kyle owes Jennifer half of a $100,000 "brick of cash" that he kept in a safe in their home.

{¶ 62} Kyle responds that Jennifer was already awarded half of the money he received as payment for the Skid Steer and Bobcat. He contends that Jennifer offered no qualified opinions of their worth, nor did she offer qualified opinions of the worth of

28.

other personal property such as his guns or tools.  Kyle insists that Jennifer was credited for her share of the Silverado and provided no evidence of its value.  He acknowledges that a brick of cash once existed, but he maintains that his trial testimony made clear that this money was spent during the marriage for the parties' joint expenses, including the costs of their daughter's wedding.

{¶ 63} As previously discussed, the valuation of marital assets is an issue of fact for the trial court.  *Ruetz,* 6th Dist. Lucas No. L-02-1037, 2003-Ohio-4091, at ¶ 41.  In determining a value, the trial court is charged with weighing the evidence and determining the credibility of the witnesses.  *Wideman*, 6th Dist. Wood No. WD-02-030, 2003-Ohio-1858, at ¶ 21.  It may accept or reject a party's opinion as to value, so long as its decision is support by evidence in the record.  *Id*.  We review a trial court's valuation of marital property using the manifest-weight-of-the-evidence standard.  *Jackson*, 6th Dist. Fulton No. F-12-013, 2014-Ohio-1145, at ¶ 17, citing *Schuller,* 6th Dist. Fulton No. F-96–012, 1997 WL 51223, at * 2.  We will not disturb the trial court's judgment unless it is not supported by competent and credible testimony.  *Smith,* 6th Dist. Sandusky No. S-89-3, 1990 WL 1357, at *6.

### 1.  The Vehicle

{¶ 64} With respect to Kyle's vehicle, Jennifer testified that she believed his vehicle—a 2007 Silverado with over 100,000 miles—was worth $20,000.  The Kelley Blue Book estimates a value of only $9,108.  The trial court accepted the Blue Book

29.

value, credited Jennifer with half of that amount, $4,554, and ordered that it be deducted from the overpayment she received for her half of the equity in the marital residence. Jennifer complains that this was error because Kyle said he would never accept this low of an amount for the vehicle.

{¶ 65} Ohio courts routinely rely on Kelley's Blue Book in valuing automobiles. *See Collins v. Collins,* 3d Dist. Marion No. 9-11-32, 2012-Ohio-749, ¶ 15 ("David also supported his testimony with a Blue Book website printout, admitted as Defendant's Exhibit 7."); *Deemer v. Deemer,* 3d Dist. Marion No. 9-05-06, 2006-Ohio-1658, ¶ 7 (accepting husband's evidence of vehicle's value where he attached a valuation from Kelley's Blue Book and wife presented no evidence "beyond unsupported pretrial statement"); *Bostick v. Bostick,* 8th Dist. Cuyahoga No. 90711, 2008-Ohio-5119, ¶ 27 ("[W]ith respect to the cars, the trial court accepted Husband's valuations as demonstrated by the Kelley Blue Book, an accepted guide to used car pricing."); *King v. King,* 4th Dist. Washington No. 13CA7, 2014-Ohio-5836, ¶ 3; (finding no competent, credible evidence to support the court's value of $8,750 where husband provided three Kelley Blue Book values that were all higher than $9,500). What's more, Kyle testified that he would never accept the Kelly Blue Book value not because it was an incorrect estimation of the vehicle's worth, but because he cannot afford to replace the vehicle. We find that the trial court's valuation of the Silverado at $9,108 was supported by

30.

competent, credible evidence and the trial court properly credited Jennifer for half its value.

## 2. The Guns, Mule, Mower, Tools, Skid Steer, and Bobcat

{¶ 66} With respect to Kyle's guns, Jennifer testified that she was not sure how many guns Kyle has and did not know their exact values. Kyle testified that he paid $240 for one of his hunting rifles and his other guns cost somewhere between $125 to $250 each. The trial court accepted that Kyle owns approximately 13 guns (that were not gifts) with values ranging from $240 to $380 each. (At an average of $310 per gun, this would equal $4,030.)

{¶ 67} With respect to the 2006 Mule—bought new for $7,000—and the riding lawn mower—bought after the parties separated for $3,000—the court found that no evidence had been presented as to the current value of those items.

{¶ 68} With respect to Kyle's tools, Jennifer claimed that they had a total value of $20,000. Kyle testified that he offered to give Jennifer half of the tools and she declined them. The trial court did not specifically dispose of them in its judgment.

{¶ 69} And with respect to the Skid Steer and Bobcat, Jennifer testified that her Internet search showed that the Skid Steer was worth $12,000—Kyle testified that he purchased the Skid Steer in 1996, but he could not remember what he paid for it. He purchased the Bobcat used three years ago for $9,000. Kyle testified that he sold the Skid Steer and Bobcat together to a friend for $4,000—he acknowledged that this was below

31.

fair market value and that he retains use of the items. The proceeds of the sale were in his attorney's IOLTA account and the court ordered that half the proceeds be released to Jennifer.

{¶ 70} Despite the lack of specific evidence concerning the current value of many of these items, the court "[a]s and for equitable division" of those personal items, allowed Jennifer to retain the remaining amount of the overpayment for her portion of the equity in the marital residence—$7,466.

{¶ 71} "It is expected that the court will 'place a value on the major assets owned by the parties.'" *Kiernan v. Ward,* 9th Dist. Summit No. 29994, 2022-Ohio-1303, ¶ 8, quoting *Zona v. Zona*, 9th Dist. Medina No. 05CA0007-M, 2005-Ohio-5194, ¶ 5. But "[a] trial court 'cannot be expected to value every piece of furniture, lawn equipment, and other personal property accumulated during a marriage * * *.'" *Id.,* quoting *Kohler v. Kohler,* 9th Dist. Lorain No. 96CA006313, 1996 WL 455850, *3 (Aug. 14, 1996). "[T]he overarching goal is to create an equitable distribution" of marital property," and the court has discretion in fashioning that distribution. *Id.,* citing *Hunt v. Hunt,* 9th Dist. Lorain No. 21CA011720, 2022-Ohio-412, ¶ 8. Consequently, an appellate court "will not overturn those discretionary determinations absent an abuse of discretion." *Kiernan* at ¶ 8, citing *Hunt* at ¶ 8; *Fetzer v. Fetzer,* 9th Dist. Wayne No. 12CA0036, 2014-Ohio-747, ¶ 34.

32.

{¶ 72} Moreover, a trial court does not err in failing to perform valuations of marital property where the parties have not provided sufficient, credible evidence for the court's consideration. *Roberts v. Roberts*, 10th Dist. Franklin No. 08AP-27, 2008-Ohio-6121, ¶ 24. In that situation, the court must make a division as it deems equitable. *Id.*

{¶ 73} In *Roberts*, the trial court found—and the appellate court agreed—that the parties had failed to present convincing evidence of the value of several household items. *Id.* at ¶ 21. There, husband and wife stated "the original cost of a few of the items." *Id.* The court observed that "these figures were of little help in determining their present values[,] * * * [t]hus, both parties' testimony on this issue was severely lacking." *Id.* The court explained that "when a party fails to present evidence as to the value of an item, it is akin to an invited error and that party has waived the right to appeal in regard to that asset." *Id.*

{¶ 74} Here, in the absence of competent, credible evidence as to the current value of these items of personal property, the court devised an equitable division to the best of its ability given the information provided to it. We find no abuse of discretion in its division of this marital property.

### 3. The Brick of Cash

{¶ 75} The parties agreed that at one point, Kyle had a "brick of cash" that totaled $100,000—cash he had been saving his whole life. Jennifer testified that she had last seen the "brick of money" three or four years earlier. Kyle testified that the cash had

33.

been depleted because he had paid cash for several high-priced marital expenditures, including their daughter's wedding--$10,000; the purchase of one of the parties' properties in Fitchville--$22,500; the purchase of property in Cincinnati--$15,500; trips to Punta Cana; and living expenses for two months of time he spent rehabbing their daughter's house, during which he was not getting paid. Kyle also testified that he paid for his 2007 Harley with that money, and Jennifer had taken $15,000.

{¶ 76} The trial court accepted that the brick of cash had been depleted. We find that there was competent, credible evidence to support the trial court's conclusion.

{¶ 77} Finally, there are no details in the record concerning Jennifer's $11,700 credit card debt. We have addressed all remaining aspects of Jennifer's challenge to the property distribution in other sections of this decision.

{¶ 78} We find Jennifer's sixth assignment of error not well-taken.

### G.  Return to Maiden Name

{¶ 79} In her seventh assignment of error, Jennifer argues that the trial court erred when it failed to restore her to her maiden name. She claims that she raised the issue of being returned to her maiden name in her proposed findings of fact and conclusions of law, and again in her objection to the magistrate's decision. Kyle responds that a nunc pro tunc entry could have been utilized to effect Jennifer's name change or she can apply to the probate court for a name change.

34.

{¶ 80} Under R.C. 3105.16, "[w]hen a divorce is granted the court of common pleas shall, if the person so desires, restore any name that the person had before the marriage." Use of the word "shall" demonstrates that this duty is mandatory. *Brown v. Brown,* 12th Dist. Madison No. CA2008-08-021, 2009-Ohio-2204, ¶ 82.

{¶ 81} In *Brown,* wife failed to request in her complaint that she be restored to her maiden name, but made an oral request during the final hearing before the magistrate, made a request in writing through her proposed findings of fact and conclusions of law, and raised the issue in her objections to the magistrate's decision. The appellate court found that consistent with R.C. 3105.16, the trial court erred when it failed to restore her former name. *See also Collins v. Collins,* 3d Dist. Marion No. 9-10-53, 2011-Ohio-2339, ¶ 8 (finding that trial court was required to restore wife to her former name where wife made request in her prayer for relief in her divorce complaint). *See also Havrilla v. Havrilla*, 9th Dist. Summit No. 27064, 2014-Ohio-2747, ¶ 6 (concluding that trial court erred in failing to return wife to maiden name where divorce decree was silent on the issue); *Reisz v. Tusing*, 9th Dist. Lorain No. C.A. 3884, 1986 WL 2476 (Feb. 19, 1986), *2 (sustaining wife's assignment of error where domestic relations court approved husband's proposed journal entry of divorce in its entirety, neglecting wife's request for restoration of her maiden name); *Hunt v. Hunt*, 7th Dist. Belmont No. 87-B-46, 1988 WL 37972, *1 (Apr. 8, 1988), ("[A] court coming on to grant a final divorce must react to the

35.

desire of a person requesting restoration of her name that she had previous to the marriage.").

{¶ 82} Here, Jennifer did not make a request to restore her maiden name in her complaint. We have reviewed the transcript of the trial and see no request for a name change in those proceedings. Jennifer's proposed findings of fact and conclusions of law, however, do reflect a request that she be returned to her maiden name, and the proposed judgment entry that she attached to her objections to the magistrate's report contains reference to her desire to have her maiden name restored. The better practice would have been for Jennifer to have explicitly requested the name change in her complaint, at trial, in the proposed findings of fact, and in her objections to the magistrate's report. However, because a request was made (albeit not very prominently), the statute mandates that such a request be granted, and the magistrate and the trial court appear to have overlooked the request entirely, we find that the request should have been addressed and granted.

{¶ 83} Kyle incorrectly suggests that this matter could have been resolved via a nunc pro tunc entry. "A nunc pro tunc entry is properly used to correct clerical errors, and not to make substantive changes to a judgment." (Citations omitted.) *Watkins v. Allstate Vehicle & Property Ins. Co.,* 6th Dist. Lucas No. L-19-1235, 2020-Ohio-3397, ¶ 49, *appeal not allowed,* 160 Ohio St.3d 1409, 2020-Ohio-4574, 153 N.E.3d 113. The trial court's failure to return Jennifer to her maiden name was not a mere clerical error.

Accordingly, we find Jennifer's seventh assignment of error well-taken. We remand this matter to the trial court so that it can modify the judgment to restore Jennifer to her former name of Jennifer Ott.

{¶ 84} Finally, although not raised by any party, we observe that the trial court judgment recites an incorrect date of marriage. Specifically, at paragraph 2(b) of the findings of fact, the date of marriage is listed as October 20, 2009, when it should be October 20, 1990. We sua sponte remand this matter to the trial court so that it can modify its judgment to reflect the parties' correct date of marriage—October 20, 1990.

### III. Conclusion

{¶ 85} We reverse, in part, and affirm, in part, the October 1, 2021 judgment of the Erie County Court of Common Pleas, Domestic Relations Division.

{¶ 86} With respect to Jennifer's first assignment of error, we conclude that the trial court's decision declining to accept Jennifer's expert's opinion concerning the value of the marital residence was supported by competent, credible evidence. We find her first assignment of error not well-taken.

{¶ 87} With respect to Jennifer's second assignment of error, we find no error in the trial court's rejection of Jennifer's claim that she did not intend to release her dower rights as to real property Kyle sold to his father. We find her second assignment of error not well-taken.

37.

{¶ 88} With respect to Jennifer's third assignment of error, we find that the evidence was sufficient for the trial court to form a firm belief or conviction that real property gifted to Kyle by his parents was his separate property. We find her third assignment of error not well-taken.

{¶ 89} With respect to Jennifer's fourth assignment of error, we find no abuse of discretion in the trial court's decision not to award spousal support here. We find her fourth assignment of error not well-taken.

{¶ 90} With respect to Jennifer's fifth assignment of error, we find no abuse of discretion in the trial court's decision to allocate $15,000 of debt to only Jennifer. We find her fifth assignment of error not well-taken.

{¶ 91} With respect to Jennifer's sixth assignment of error, we find that the trial court's valuation determinations are supported by competent, credible evidence, and the trial court did not abuse its discretion in its division of certain of the parties' accounts and personal property. We find her sixth assignment of error not well-taken.

{¶ 92} With respect to Jennifer's seventh assignment of error, we find that the trial court erred in failing to restore Jennifer to her maiden name. We find her seventh assignment of error well-taken and remand this matter to the trial court so that it can modify its judgment to reflect that Jennifer Lynn Galloway is restored to her maiden name, Jennifer Lynn Ott.

38.

**{¶ 93}** We also find, sua sponte, that the trial court judgment recites an incorrect date of marriage. On remand, the trial court shall amend its judgment to reflect that the parties' date of marriage was October 20, 1990—*not* October 20, 2009.

**{¶ 94}** The parties are ordered to share in the costs of this appeal under App.R. 24.

Judgment reversed, in part,<br>and affirmed, in part.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.                        _____
                                                       JUDGE

Thomas J. Osowik, J.

                                      _____
Christine E. Mayle, J.                                   JUDGE
CONCUR.

                                      _____
                                                       JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.