[Cite as *Turner v. Turner*, 2023-Ohio-1298.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

Sarah L. Turner                                        Court of Appeals No.  WD-22-025

     Appellee                                         Trial Court No.  2019-DR-0177

v.

Jeffrey A. Turner                                      **DECISION AND JUDGMENT**

     Appellant                                        Decided:  April 21, 2023

* * * * *

Martin J. Holmes, Sr., for appellee.

Donna M. Engwert-Loyd, for appellant.

* * * * *

**DUHART, J.**

{¶ 1} This is an appeal by appellant, Jeffrey Turner, from the April 1, 2022 judgment of the Wood County Court of Common Pleas, Domestic Relations Division, which awarded appellee, Sarah Turner, a brokerage account as her separate property.  For the reasons that follow, we affirm.

{¶ 2} Jeffrey[1] sets forth two assignments of error:

1. The trial court erred in determining that a Brokerage Account acquired during the parties' marriage which was originally in joint names and retitled at a point during the marriage to [Sarah], Transfer on Death to [Jeffrey], was determined to be a gift to [Sarah] and therefore a non-marital asset.

2. The trial court erred in awarding [Sarah] Brokerage Account 5793 as [Sarah] did not sustain her burden of showing by clear and convincing evidence that [Jeffrey] made an *inter vivos* gift of the Brokerage Account to her as her separate property.

## Background

{¶ 3} Sarah and Jeffrey married in 1993, and had six children. Throughout the majority of their marriage, Jeffrey was a financial advisor, while Sarah was a stay-at-home mother. Jeffrey is also a lawyer, but is on inactive status. Starting in 2001, Jeffrey was employed at Fifth Third Bank as a financial advisor, and the family's financial accounts were located there. In 2001 or 2002, a joint brokerage account, account number ending in 5488, was established and funds were deposited monthly into the account until 2015.

---

[1] For ease of discussion, we will refer to the parties by their first names.

2.

**{¶ 4}** On May 5, 2015, Jeffrey resigned from Fifth Third and became an independent financial advisor at Savage and Associates. He moved the family's accounts, including the joint brokerage account, to Savage. In late May of 2015, he was sued by Fifth Third.

**{¶ 5}** In August of 2015, the joint brokerage account was placed or re-titled into Sarah's name only, and a new account number ending in 5793, was established. This brokerage account had a beneficiary designation which named Jeffrey as the beneficiary upon Sarah's death. In November of 2015, Fifth Third dismissed its lawsuit. The brokerage account remained in Sarah's name only.

**{¶ 6}** On December 31, 2019, Sarah filed a complaint for divorce. In 2021, five days of hearings were held before the magistrate. On December 27, 2021, the magistrate issued his decision ("the Decision") concluding, inter alia, the brokerage account is Sarah's separate property and not subject to division. Jeffrey filed objections.

**{¶ 7}** On April 1, 2022, the trial court issued its order and judgment entry. The trial court granted the parties a divorce, approved the Decision, adopted the findings with respect to, inter alia, the gifting of the brokerage account from Jeffrey to Sarah, and awarded 100% of the brokerage account to Sarah, as her separate property.

**{¶ 8}** Jeffrey appealed.

3.

## The Decision

### Magistrate's Findings

{¶ 9} Relevant to Jeffrey's appeal, the magistrate found:

445. Sarah was asked about * * * her 2019 court schedule, * * * where separate property claims are to be listed.  [She] did not list one.  When asked at the hearing whether she received gifts during the marriage, she said she received gifts from her parents but nothing more than that.  She also testified about the gift from Jeffrey in 2015 of the brokerage account; and jewelry.

446.  Referencing Joint Exhibit 1, and the $20,000 jewelry entry, Sarah noted these gifts:

a. Wedding ring[.]

b. Anniversary ring, received at Christmas time, given near her birthday.

c. Earrings, no special occasion, a gift from Jeffrey.

d. Mother's ring[.]

447.  When asked how these items of jewelry were picked out, she said she and Jeffrey chose them together.  She said it was clear [he] gifted these items to her, he put the rings on her fingers.

448. Regarding the brokerage account, Sarah said this account was created with the parties' incomes.  She was not sure when the account was

4.

originally opened. When asked how the account was retitled in her name, [she] noted the Fifth-Third lawsuit was filed [sic]. She said early on, referencing a couple months after the lawsuit was filed, Jeffrey transferred the account to her name only. He said he was giving it to her only. He was putting it in her name only. It was necessary for her to sign something.

449. Sarah's attention was drawn to Exhibit M, * * * August 13, 2015, Savage Account Statement. The statement lists balances and investment holdings in four accounts. One of the accounts ends in [5488,] this is the brokerage account about which the parties have a marital vs. separate property dispute.

450. Sarah's attention was drawn to Exhibit N, one page of the Savage Account Statement dated August 14, 2015, which does not list the [5488] account, but does list an account with the same holdings, in [her] name individually, account number [5793]. Jeffrey is not listed as a joint holder of this account. The account and assets in [5488] were retitled in [her] name, in account [5793].

451. When asked about the discussions concerning the transfer process, Sarah testified that Jeffrey said he did not want to hold the asset, he did not want it to be taken from him. When asked how many times he discussed this, [she] said more than one time.

5.

452. When asked how the assets in account[s] [5488] and [5793] were accumulated, Sarah said the parties put their money in an investment account and it grew.

453. When asked about discussions between the parties concerning what the account assets should be used for, she did not recall such a discussion. She understood that the assets in the account included mutual funds and stocks. She did not know whether the funds had individual shares of stocks, as opposed to a fund. She agreed she received monthly or periodic statements. She put the statements in the filing cabinet in the basement.

454. Sarah said once a year (on average) the parties would discuss their financial position.

455. When asked whether she managed the brokerage account, as far as Sarah knew Royal Alliance did. When asked whether she had ever contacted Royal, [she] said not until last year. She considered Jeffrey to be the investor of the family. When asked whether he managed the brokerage account, [she] said Royal Alliance did. She said she received correspondence from Royal but not phone calls. She never asked Jeffrey to move the funds to another account. [He] was the financial planner. When asked whether she took an active part in managing the account, [she] said Royal managed the account.

6.

456. When asked why the account was not specifically identified in her December 2019 court schedule, Sarah said she completed the schedule without any assistance. She noted that she also did not list her earrings. She said she did not have all the information she needed. She also noted that she did not know what a separate property claim was. She did review the stated definition of a separate property claim "This includes, but is not limited to, inheritances, property owned before marriage, and any pre-marital agreements." [She] did not think those definitional phrases applied.

457. Concerning * * * her Amended Affidavits of Income and Expenses, Sarah agreed that to the best of her knowledge, an amended property or asset schedule was not filed.

458. When asked when she became aware that the brokerage account was in her name only, Sarah said she was aware of this when Jeffrey put it in her name. She had to sign documents.

459. When asked how she controlled the brokerage account, Sarah said it manages itself, through Royal. As far as she knew, neither she nor Jeffrey made any trades in the account. Later she thought that there might have been one stock trade made. She said the company would have done that, if it was made. She was not sure if Jeffrey made a stock trade. She believes the management fees are deducted from the account. She is not sure of the amount; she thought it depended on the income earned.

7.

460. Sarah said that since 2015 she was never asked to liquidate an account or move funds from one account to another. When asked what the current cash component of the account is, [she] said she would need to look at the statement. She has looked at it online, a couple of times; the first time was last year.

461. Sarah believes that Jeffrey is the listed beneficiary on the brokerage account. When asked whether she has changed that, she said "not yet." She has not contributed funds to the brokerage account.

* * *

511. Concerning account [5488], the disputed brokerage account, Jeffrey said this was initially a joint account at Fifth-Third, opened in 2001 or 2002. He deposited funds into the account monthly. When he resigned from Fifth-Third, he moved the account to Savage.

512. Jeffrey resigned his position at Fifth-Third on May 5, 2015. The bank filed a lawsuit against him that month. The lawsuit was dismissed on November 1, 2015. No settlement was negotiated or reached.

513. Jeffrey testified that when he took his new position at Savage, he initially had no clients. Subsequently, clients retained him and he began earning income. He brought clients in. [He] noted, in connection with the Fifth-Third complaint, that an injunction was in place for approximately

8.

four months, preventing him from contacting clients from June to September 2015.

514. The brokerage account [5488] was established as a joint account in 2001. The parties had three children at the time and a larger family planned. They wanted to start establishing funds for their education. Jeffrey noted that the parties had little cash reserves, having committed substantial funds to retirement accounts. Accordingly, the brokerage account was a non-tax-qualified account for multiple purposes, including college, as opposed to creating 529 Plans. It was an account to pay for college tuition.

515. Jeffrey was asked whether he and Sarah discussed the brokerage account prior to August 13, 2015. He said he and [she] discussed their financial position and some documents annually, perhaps at an anniversary outing.

516. Jeffrey was asked whether he and Sarah discussed re-titling the brokerage account. He said they did. He said when Fifth-Third filed the lawsuit, he was concerned that they would not have any money to put their children through college.

* * *

525. Concerning the disputed brokerage account about which the parties now contest marital v. separate property status, Jeffrey said the

account was developed for the parties' children's education and other expenses of the marriage.

526. * * * Jeffrey described [the Fifth-Third] legal action as an intensive lawsuit. Concerning the joint brokerage account, in August 2015 [he] arranged for the account [to] be retitled in Sarah's name individually. He said his father referred him to an attorney to review what assets could be attached if Fifth-Third secured a judgment in its lawsuit.

527. * * * Jeffrey said [t]he account now has a beneficiary designation, naming [him] as the beneficiary (to receive the assets upon Sarah's death [Transfer On Death]). [He] said he retitled the account to prevent creditors from having access to the account, or attempting an execution of a judgment in the lawsuit.

528. Jeffrey identified Exhibit N as an August 14, 2015 Savage account balance statement showing the brokerage account in Sarah's name, Transfer on Death. This was the previous joint brokerage account.

529. Jeffrey identified Exhibit R as a Savage balance statement of December 30, 2020, showing the brokerage account, which has remained in Sarah's individual name since August 2015. When asked about his role in the brokerage account, [he] said he is the financial advisor. He testified that the account is not managed by Royal. [He] noted the account is a brokerage account, not a managed account, managed by [a] third party. He

said the only way assets could be sold or traded was at the direction of the account holder/client.

530. Concerning 2015 through 2020, Jeffrey said he stopped funding the brokerage account monthly when he moved to the Savage group. He said he let the assets * * * "sit there." The only modification he described was changing the mutual fund to pay cash instead of diverting earnings to reinvestment. He noted that 2015 was a tough year financially. He had left his salaried position at Fifth-Third Bank. He had to rebuild a practice. When asked by his attorney what his intent was when he had the brokerage account retitled, [he] said to make it tougher on Fifth-Third if it was successful in its lawsuit against him.

531. Jeffrey testified that in the last five years Sarah has not engaged in any activity in the brokerage account. She has not asked for funds in the form of a withdrawal. She has not asked to move any of the assets. She has not taken control of the account. She did not ask him about the investments in the account.

* * *

533. Jeffrey remains a beneficiary (TOD) on the brokerage account.

* * *

548. Assets or funds held in the disputed brokerage account were not used for the parties' children's tuitions prior to May 14, 2015.

11.

549. Jeffrey agreed that after the brokerage account was retitled in Sarah's name individually, she had a right to withdraw money from the account. He noted that this was true when it was a joint account. [He] agreed that after the account was transferred into her name individually, [she] did not have to ask him for consent to withdraw funds from the account. He said [she] did not have to ask him before the 2015 transfer.

* * *

553. * * * [F]rom 2015 through 2020[,] Jeffrey * * * paid tuition for the parties' children (both high school and college). [He] noted that in 2015 he used a "forgivable loan" from Savage, $100,000. From 2016 through 2020 he paid the children's tuition * * *.

554. Jeffrey agreed that he paid the parties' children's tuition from his earnings.

* * *

564. Jeffrey agreed the items of jewelry identified at the * * * hearing were gifts to Sarah and are her separate property. These matters are the subject of stipulations * * *.

Magistrate's Conclusions of Law

{¶ 10} The magistrate decided:

633. During the course of the marriage, the parties established a joint brokerage account to hold non-tax qualified funds, perhaps for educational

purposes or simply for savings/investment. The account was first held at Fifth Third where Jeffrey worked.

634. On or about May 5, 2015, Jeffrey voluntarily resigned from Fifth Third Bank and immediately established an association with Savage & Associates. He moved his accounts from Fifth Third to Savage, including the brokerage account. A dispute arose over [his] contact with the bank's customers/clients. Fifth Third filed a legal action against [him] and secured some form of injunctive relief. * * *

635. Jeffrey testified in clear language that in 2015 he was concerned about the potential that Fifth Third might secure a judgment, or some other legal right against him, and that the brokerage account (the parties most valuable non-tax qualified asset, other than the marital home) would be vulnerable. He discussed with family members the possibility of retaining personal counsel on the question of how to protect the brokerage account from Fifth Third.

636. On August 13 or 14, 2015, Jeffrey had the brokerage account placed in Sarah's name only ([he] used the term re-titled). [She] signed the necessary documents, no doubt effectuating the transaction. The account was placed in [her] name. A new account number was established. Exhibits M and N. The new account has "transfer on death status[,]" and [Jeffrey] was named the beneficiary. [Sarah] testified that [Jeffrey] told her

he was doing this because he was worried that the account could be susceptible to the Fifth Third lawsuit. [Jeffrey] is a licensed attorney (albeit inactive) and has the capacity and education to consider such legal issues.

637. The disputed account is identified as Sarah's holding in Exhibit R, a December 30, 2020 Savage "Holdings by Investor" statement: "Account Name: Sarah L. Turner TOD DTD 08/12/2015 * * *[."]

* * *

640. Exhibit M is a Savage "Holdings by Investor" statement, as of 8/13/2015. The former brokerage account is listed as a joint asset:

"Account Name: Jeffrey A. Turner Sarah L. Turner JT TEN * * *[."]

641. Exhibit N is a portion of a Savage "Holdings by Investor" statement, as of 8/14/2015. The current brokerage account is listed there as Sarah's asset (TOD DTD 8/12/2015) and described in this manner:

"Account Name: Sarah L. Turner TOD DTD 08/12/2015 * * *[."]

642. Sarah contends that because the account was placed in her name only on August 14, 2015, and remained in her name only thereafter, and because Jeffrey initiated and effected this change to avoid exposure of the account to a potential judgment in the Fifth Third litigation, the account was gifted to her. She claims it is now her separate property. R.C. 3105.171(A)(6)(a)(vii).

14.

643. Jeffrey contends that since he retained some management control over the account after the August 14, 2015 transaction, the account remains marital.

644. "In divorce proceedings, the domestic relations court must first determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B)." *Dayal v. Lakshmipathy*, 6th Dist. No. WD-19-049, 2020-Ohio-5441, 163 N.E.3d 683, ¶ 26 * * *.

645. "Property acquired during a marriage is presumed to be marital property unless it can be shown to be separate." *Johnson v. Mills*, 8th Dist. Cuyahoga No. 102241, 2015-Ohio-4273, 2015 WL 6024247, ¶ 18. The burden of proof regarding the classification of certain property as "separate property" lies with the party seeking such a classification. *Tincher v. Tincher*, 5th Dist. Fairfield No. 2019 CA 00028, 2020-Ohio-3352, 2020 WL 3263863, ¶ 64, citing *Passyalia v. Moneir*, 5th Dist. Stark, 2017-Ohio-7033, 95 N.E.3d 723, ¶ 18 * * *.

646. In *Dayal*, husband funded an irrevocable trust with marital assets, and named wife the beneficiary. He completely divested himself of the trust assets.

* * *

648. The *Dayal* court reviewed the elements of an *inter vivos* gift: * * *

649. When considering the question of donative intent, the *Dayal* court considered the facts of the transaction * * * and the purpose of the trust * * *. The court looked at its prior decision in *Soley v. Soley*, 2017-Ohio-2817, 82 N.E.3d 43 (6th Dist.) * * *.

* * *

652. Here, it is understood that Jeffrey wanted to ensure that the parties' non-tax qualified savings, which he planned to use for his family's, and his, benefit, was shielded from Fifth Third's legal action. [He] advances no other reason for the placement of the brokerage asset solely in Sarah's name in August 2015, not: general estate planning, cash flow issues, specific educational uses, tax savings or planning, or any other stated reason.

653. Clearly Jeffrey wanted the account to be out of his name in case the Fifth Third lawsuit was successful.

654. * * * [T]he account was changed from a marital joint holding to an account only in Sarah's name; marital status to separate property. Without doubt, Jeffrey was not satisfied that the account was safeguarded from Fifth Third as a marital joint account. He sought a conversion of the former joint account to [her] sole, individual property.

655. After the Fifth Third lawsuit against Jeffrey was dismissed the account remained in Sarah's name only. Both parties seemed to agree that

the assets in the accounts were not sold or transferred. [He] testified that he was the "advisor" on the account. He said the account was not managed by Royal Alliance, or another third party. He noted that the only way assets could be sold was by consent of the client. However, he also said the assets "sat" there, or words to that effect.

656. In his proposed conclusions of law, Jeffrey notes that he was named the TOD beneficiary of the current account (a designation that was probably unnecessary when it was a joint account, Exhibit M). He asserts that he "continued to manage the account and maintained control over the account. The asset continued to be managed by [him]." Little or no evidence was presented as examples of [his] management of the account after mid-August 2015, or his control of the asset. It is not clear that [he] is contending that he can control the account, or take action in it, alone. There was no direct evidence that he tried. Logically, one might conclude that Sarah, as the sole owner, could take such action. In any event, neither party cited much action in the account after August 15, 2015, except perhaps to re-designate the use of dividends as [he] described. It was not made clear how that was accomplished administratively.

657. There is little question that had Fifth Third been successful in its legal action and attempted to execute a judgment against Jeffrey on the brokerage account, he would have taken the position that it was Sarah's

asset and beyond the scope of any such judgement or execution. He felt the prior joint status left the account vulnerable.

658. The brokerage account is not the only example of gifting during the marriage. Jeffrey gave Sarah gifts of jewelry over the years. The gifts were purchased with marital funds, no doubt. However, [he] did not oppose [her] retention of these items of jewelry. Donative intent to gift these items also rests in the circumstances of the conveyance.

659. Based on all of the evidence, and the above authority, the court concludes that the disputed brokerage account is Sarah's separate property and is not subject to division. R.C. 3109.171(A)(6)(a)(vii).

### Trial Court's Order and Judgment Entry

{¶ 11} The trial court, in approving the Decision and adopting the magistrate's findings, set forth, in relevant part:

### B. Gifting of the Brokerage Account

[Jeffrey] objects to the Decision insofar as * * * it determines the brokerage account to be separate property, acquired by [Sarah] through inter vivos gift from [Jeffrey]. * * *

The Court FINDS that the Decision thoroughly reviewed the circumstances leading to the creation of the brokerage account, the testimony offered by the parties related to the account, and admitted Exhibits M, N, and R. * * *

18.

The Court further FINDS that the Decision properly concludes that the brokerage account is separate property under R.C. 3105.071(B), and that [Jeffrey] acted with donative intent when he transferred the property to [Sarah] in order to avoid a creditor.

* * *

**IT IS THEREFORE ORDERED THAT:**

* * *

45. Sarah shall retain her jewelry, f[r]ee and clear of any interest of Jeffrey.

* * *

50. * * * Sarah L. Turner is awarded, as her separate property, free and clear of any interest of * * * Jeffrey A. Turner, 100% of the brokerage account identified in Exhibit R * * * currently held in her name. She may modify the current transfer on death designation at any time, in any manner.

### Assignments of Error

{¶ 12} Jeffrey's assignments are interrelated, so we will address them together.

### First Assignment of Error

{¶ 13} In his first assignment of error, Jeffrey argues the trial court misapplied the law that governs what is marital property versus what is separate property when title of property is transferred between spouses during a marriage. He acknowledges the parties entered into an agreement to transfer title of the brokerage account from their joint names

to Sarah's name, but he contends the stated purpose for the transfer was that he was being sued by Fifth Third and "there was an argument that he had been advised to transfer the property to protect it from a potential judgment." He asserts the lawsuit was dismissed with no judgment entered for Fifth Third, and the account was maintained by both parties thereafter.

{¶ 14} Jeffrey further argues the case law which addresses inter vivos gifts between spouses should not be applied for several reasons: he maintained control of the account as the financial advisor; he remained a 100% beneficiary of the account after it was retitled, and retained a legal interest to have it transferred to him on death; the account increased in value because of his position as financial advisor; Sarah never exercised control over the asset; and the financial disclosure forms Sarah filed with the divorce complaint indicated she believed the brokerage account was a marital asset. Jeffrey submits the trial court relied on several cases, but those cases are distinguishable on the facts.

Second Assignment of Error

{¶ 15} In his second assignment of error, Jeffrey asserts the trial court erred in awarding the brokerage account to Sarah as she did not sustain her burden of showing, by clear and convincing evidence, that he made an inter vivos gift of the account to her, as her separate property. He submits he did not relinquish any title or interest he had in the property, and he maintained control over it during the entire period from retitling to the day of trial. He also argues Sarah exercised absolutely no control over this asset, as she

20.

trusted him to handle it as he handled all of their accounts - wisely and in both parties' best interest.

## Law

{¶ 16} "In divorce proceedings, the domestic relations court must determine what constitutes marital property and what constitutes separate property. R.C. 3105.171(B)." *Galloway v. Galloway*, 6th Dist. Erie No. E-21-043, 2023-Ohio-29, ¶ 21.

{¶ 17} R.C. 3105.171 provides in relevant part:

(A) As used in this section:

* * *

(3)(a) "Marital property" means, subject to division (A)(3)(b) of this section, all of the following:

(i) All * * * personal property that currently is owned by either or both of the spouses, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(ii) All interest that either or both of the spouses currently has in any * * * personal property, including, but not limited to, the retirement benefits of the spouses, and that was acquired by either or both of the spouses during the marriage;

(iii) Except as otherwise provided in this section, all income and appreciation on separate property, due to the labor, monetary, or in-kind

contribution of either or both of the spouses that occurred during the marriage;

* * *

(6)(a) "Separate property" means all real and personal property and any interest in real or personal property that is found by the court to be any of the following:

* * *

(vii) Any gift of any real or personal property or of an interest in real or personal property that is made after the date of the marriage and that is proven by clear and convincing evidence to have been given to only one spouse.

* * *

(B) In divorce proceedings, the court shall * * * determine what constitutes marital property and what constitutes separate property. * * * [U]pon making such a determination, the court shall divide the marital and separate property equitably between the spouses, in accordance with this section. For purposes of this section, the court has jurisdiction over all property, excluding the social security benefits of a spouse other than as set forth in division (F)(9) of this section, in which one or both spouses have an interest.

* * *

(H) Except as otherwise provided in this section, the holding of title to property by one spouse individually or by both spouses in a form of co-ownership does not determine whether the property is marital property or separate property.

## Standard of Review

{¶ 18} The determination of what constitutes marital property and what constitutes separate property involves mixed questions of law and fact, and is not a discretionary matter. *Galloway* at ¶ 21, citing *Dayal*, 2020-Ohio-5441, 163 N.E.3d 683, at ¶ 26. "'We review the domestic relations court's characterization of property under the manifest weight of the evidence standard.'" *Id.*, quoting *Dayal* at ¶ 26. "We will not reverse a judgment as against the manifest weight of the evidence if it is supported by some competent, credible evidence." (Citations omitted.) *Id.* Manifest weight of the evidence pertains to the burden of persuasion. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21.

## Gifting

{¶ 19} With respect to gifting between spouses, a method for effecting the change of marital property to separate property is through an inter vivos gift of the property from the donor spouse to the donee spouse. *Soley*, 2017-Ohio-2817, 82 N.E.3d 43, at ¶ 19. "The essentials of a valid gift inter vivos are (1) an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and

23.

there, and (2) in pursuance of such intention, a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible, considering its nature, with relinquishment of ownership, dominion, and control over it." *Bolles v. Toledo Trust Co.*, 132 Ohio St. 21, 4 N.E.2d 917 (1936), paragraph one of the syllabus. *See also Soley* at ¶ 20.

{¶ 20} Under R.C. 3105.171(H), courts in Ohio use "'a flexible totality-of-the-circumstances test to determine whether transmutation of the * * * property has occurred.'" (Citation omitted). *Soley* at ¶ 22. Hence, "'the form of title is relevant to, but not conclusive of, the classification of property as being either marital or separate.'" (Citation omitted.) *Id.*

{¶ 21} The donee has the burden of showing, by clear and convincing evidence, that the donor made the inter vivos gift. *Id.* at ¶ 20. *See also Bolles* at paragraph two of the syllabus. Clear and convincing evidence is "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 104, 495 N.E.2d 23 (1986).

**Analysis**

{¶ 22} Jeffrey takes issue with the trial court's application of the law regarding inter vivos gifts. We note that the trial court relied on, inter alia, *Soley* and *Dayal*, in

reaching the conclusions that the brokerage account is Sarah's separate property, and that Jeffrey acted with donative intent when he transferred the brokerage account to Sarah to avoid a creditor.

{¶ 23} Jeffrey also challenges the trial court's award of the brokerage account to Sarah, as he claims she did not show, by clear and convincing evidence, that he made an inter vivos gift of the account to her, as her separate property.

*Soley*

{¶ 24} Husband acquired real estate prior to his marriage. *Soley*, 2017-Ohio-2817, 82 N.E.3d 43, at ¶ 21. During the marriage, he deeded his real estate to his wife, in order to avoid his creditors. *Id.* at ¶ 2. Thereafter, a divorce action was filed. *Id.* The magistrate found husband's transfer of property to his wife did not constitute a gift and did not convert the separate property into marital property, because husband did not possess the requisite donative intent when he executed the quitclaim deed in order to avoid his creditors. *Id.* at ¶ 4. Wife filed objections to the magistrate's decision, which the trial court overruled. *Id.* at ¶ 5. The trial court adopted the magistrate's decision. *Id.* Wife appealed. *Id.* at ¶ 6.

{¶ 25} On appeal, this court noted the record showed husband deeded the property to his wife "for the sole purpose of placing the property beyond the reach of his creditors." *Id.* at ¶ 26. We concurred with other Ohio courts in holding that a person acts with donative intent when transferring property for the purpose of evading creditors. *Id.* We found the trial court's determination, that husband lacked donative intent when he

transferred the property to his wife, was against the manifest weight of the evidence. *Id.* We also found the trial court's classification of the property as husband's separate property was against the manifest weight of the evidence since husband gifted the property to his wife during the marriage, making the property marital. *Id.*

*Dayal*

{¶ 26} In 2012, during his marriage, husband created an irrevocable trust. *Dayal*, 2020-Ohio-5441, 163 N.E.3d 683, at ¶ 5. Since the trust was irrevocable, the property held by the trust no longer belonged to husband, and was excluded from his estate and not subject to estate taxation if he untimely died. *Id.* at ¶ 9. Wife filed for divorce in 2016. *Id.* at ¶ 14. The parties did not agree as to whether the trust assets were marital assets subject to equitable division, or wife's separate property not subject to division; the issue was submitted to the court. *Id.* at ¶ 17.

{¶ 27} Wife testified she did not know the details surrounding the formation of the trust at the time of her execution of the trust agreement, and during her deposition, she stated she had no discussion with husband regarding the trust prior to its formation, and that she first became aware of the extent of the assets held by the trust during the divorce proceedings. *Id.* at ¶ 13.

{¶ 28} The magistrate determined, inter alia, the trust was marital property subject to equitable division. *Id.* at ¶ 18. Wife filed objections to the magistrate's decision, which the trial court overruled. *Id.* at ¶ 19, 20. The trial court approved of and adopted the magistrate's decision. *Id.* at ¶ 20. Wife appealed. *Id.* at ¶ 22.

26.

{¶ 29} On appeal, this court noted the record showed the irrevocable trust was funded with assets acquired during the parties' marriage, which constituted marital property. *Id.* at ¶ 29. Wife argued the trust assets became her separate property when husband created the irrevocable trust naming her the beneficiary, and completely divested himself of the trust assets. *Id.*

{¶ 30} This court determined there was no question that husband delivered the property to wife, as beneficiary, when he deposited funds into the irrevocable trust in 2012, and that wife accepted the assets, as evidenced by her execution of the trust agreement naming her beneficiary of the irrevocable trust. *Id.* at ¶ 32. We further determined, based on the language of the trust agreement, husband's trial testimony and his filing of a 2012 gift tax return, that he possessed the requisite donative intent to make an inter vivos gift to wife. *Id.* at ¶ 35. We also stated:

> Now, eight years later, [husband] advances an argument that is inconsistent with his actions in 2012 and in contravention to his characterization of the transfer of funds into the [irrevocable] Trust that he took in filing his 2012 gift tax return. In essence, [he] seeks to reclassify his transfer of funds into the [irrevocable] Trust because the couple's relationship has now deteriorated. However, the developments that have transpired over the intervening years since the [irrevocable] Trust was created do not vitiate the donative intent that husband possessed at the time of the transfer of funds in 2012.

27.

*Id.* at ¶ 36.

Current Case

{¶ 31} We have reviewed the entire trial court record consisting of, inter alia: the parties' testimony in the deposition transcripts; the testimony set forth in the hearing transcripts; the exhibits; the magistrate's extensive findings of fact and comprehensive conclusions of law in the Decision; and the trial court's order and judgment entry adopting and approving the Decision. We have also examined the applicable law, including our Sixth District Court of Appeals decisions, *Soley* and *Dayal*.

{¶ 32} There is no question the brokerage account was opened during the parties' marriage, was funded with marital assets, was initially a joint account titled in both parties' names, and was, therefore, marital property. The parties' dispute centers on whether the brokerage account remained marital property or became Sarah's separate property after the account was placed in Sarah's name only.

{¶ 33} The evidence in the record, including testimony and exhibits, shows the parties' joint brokerage account was transferred into Sarah's name only, and a new account number was established. This transaction was accomplished by Jeffrey, who testified at the hearing, "I retitled the account into * * * my wife's name * * * as a way to prevent possible creditors or a lawsuit judgment from being attached. * * * The intent was to basically keep it -- make it a little tougher if Fifth Third was successful in the lawsuit." Sarah testified at the hearing the reason Jeffrey put the account in her name was "[he] was being sued by Fifth Third and he wanted to give that money to me to put it

28.

into my name only so that * * * if he lost the lawsuit or whatever happened, he could -- I guess he'd, say, hide it from creditors and it would be mine alone."

{¶ 34} We find the evidence demonstrates that Jeffrey transferred the joint brokerage account, which was marital property, to Sarah, alone, in order to protect or safeguard the property from Fifth Third, a potential creditor. We find Jeffrey intended to transfer the brokerage account to Sarah, he effectuated that transfer by ensuring the brokerage account was placed in Sarah's name only, and he thereby relinquished his ownership, dominion, and control over the brokerage account. While Jeffrey testified he was the financial advisor on the brokerage account, he acknowledged the brokerage account was not a managed account. Moreover, Jeffrey testified the only way assets could be sold or traded was at the direction of the account holder/client; Sarah is the account holder/client of the brokerage account. We further find Jeffrey's transfer of the marital property, with the purpose of avoiding a creditor, constitutes clear and convincing evidence of donative intent to convert the marital property into Sarah's separate property. *See Soley* at ¶ 26; *Dayal* at ¶ 44.

{¶ 35} We therefore conclude the trial court did not err in awarding Sarah the entire brokerage account, as Sarah sustained her burden of showing by clear and convincing evidence that Jeffrey made an inter vivos gift to her. We further conclude that the trial court's determination that Jeffrey gifted the parties' joint brokerage account to Sarah, alone, as her separate property, was not against the manifest weight of the

29.

evidence. Accordingly, we find Jeffrey's first and second assignments of error not well-taken.

## Conclusion

**{¶ 36}** The April 1, 2022 judgment of the Wood County Court of Common Pleas, Domestic Relations Division, is affirmed. Appellant, Jeffrey Turner, is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.                 _____

                                                  JUDGE

Gene A. Zmuda, J.

                                            _____

Myron C. Duhart, P.J.                         JUDGE
CONCUR.

                                            _____

                                                  JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions. Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.