[Cite as *Lockhart v. Anick*, **2025-Ohio-4496.**]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Sarah Lockhart

    Appellant/Cross-appellee

v.

Robert Anick, Jr.

    Appellee/Cross-appellant

Court of Appeals No.  L-24-1174

Trial Court No.  CVH-23-08999

**DECISION AND JUDGMENT**

Decided: September 26, 2025

* * * * *

Danamarie K. Pannella, for appellant/cross-appellee.

Brian J. Hoch, for appellee/cross-appellant.

* * * * *

**ZMUDA, J.**

### I.  Introduction

{¶ 1} In this appeal, appellant/cross-appellee, Sarah Lockhart, and appellee/cross-appellant, Robert Anick, Jr., appeal the Toledo Municipal Court's decision from June 14, 2024 granting permanent possession of the cat Fluffy to Anick and granting permanent possession of the dog Mango to Lockhart.  For the following reasons, we affirm in part and reverse in part.

## II. Facts and Procedural Background

{¶ 2} Lockhart and Anick started a romantic relationship in or around February 2018 and lived together in North Carolina until they separated in November or December 2019. Mango and Fluffy belonged to Lockhart when Lockhart and Anick moved in together. During Lockhart and Anick's relationship, Mango had a biting tendency, which both parties attributed to Mango's anxiety.

{¶ 3} After the parties separated, Lockhart took the pets with her and moved to San Antonio, Texas. Anick moved to Toledo, Ohio. In May or June 2020, Lockhart began living with her new partner, Paige Hurlbut. At some point in August 2020, Hurlbut was bitten by Mango and had to seek medical treatment at a hospital. After the bite, Lockhart called Anick to ask if the pets could live with him. Anick agreed, and on September 7, 2020, Lockhart and Hurlbut drove the pets to Anick's residence in Toledo.

{¶ 4} For nearly two years, the pets remained with Anick. Lockhart and Anick contacted each other minimally, limiting communication to updates about the pets' health and well-being. Lockhart and Hurlbut visited the pets—with Anick's permission—once during that period, in May 2021.

{¶ 5} On July 19, 2022, Lockhart informed Anick that she was ready to retrieve the pets from him. Anick, denying that the arrangement was temporary, refused to turn over possession of the pets to Lockhart.

{¶ 6} Lockhart filed a complaint with one count of conversion and one count of replevin against Anick to recover possession of Fluffy and Mango in Toledo Municipal

2.

Court on July 6, 2023. The parties appeared before the court on December 14, 2023 for a bench trial before a magistrate. Three witnesses testified, including Lockhart and Anick themselves, as well as Lockhart's partner, Paige Hurlbut.

### *Testimony of Paige Hurlbut*

{¶ 7} Hurlbut testified that on the day she was bitten, Mango was upset that Lockhart tried to leave their home, which was not unusual for Mango. Hurlbut picked up Mango to move him to another room at Lockhart's request, and Mango bit Hurlbut's hands.

{¶ 8} After taking Hurlbut to the emergency room, Lockhart decided they needed someone to look after the pets while Lockhart worked on her own mental health. Hurlbut testified about her understanding of Lockhart's plans for the pets as follows:

> A: From what [Lockhart and I] talked about, it was definitely going to be an unknown period of time because mental health isn't something that you can just fix within a couple of months, especially something as severe as she was going through. So we never gave a time limit. It was just very known that it was going to be temporary and that she would let him know when that time was to come.
>
> Q: Okay. And was it your understanding that she was giving ownership over to Mr. Anick?
>
> A: That was never the case.

However, Hurlbut admitted that she did not hear Lockhart's phone conversation with Anick when Lockhart asked Anick to take the pets.

{¶ 9} Hurlbut went with Lockhart to bring the pets to Anick in September 2020. She described the exchange between Lockhart and Anick as follows:

> [Lockhart] let him have all the toys. She gave [Anick] all the paperwork that showed all the past vet bills, all the past vet summaries, anything that

3.

he might need in the event that he's not able to get in touch with her. She wanted to make sure that he could do what he needed while she's getting care. While – after it was all over and we were going to leave, he looked at us and said anytime you want, just come on back; they'll be here.

### *Testimony of Sarah Lockhart*

{¶ 10} Lockhart testified about her mental health's impact on Mango, explaining that she had been concerned that her own anxiety escalated Mango's behavior. When Mango bit Hurlbut, Lockhart realized her mental health was affecting her pets' quality of life, and she needed to place them with someone else while she worked on improving her mental health. Lockhart trusted Anick to take care of the pets because he was good to them when they lived together.

{¶ 11} Lockhart explained all of this during her phone call with Anick when she asked him to take Mango and Fluffy. Lockhart asked Anick to take Fluffy as well as Mango because the two pets were bonded and she didn't want to separate them. During her phone conversation with Anick, she never indicated the amount of time the pets would live with Anick, nor whether the arrangement would be permanent or temporary. Lockhart maintained that neither party said anything during the phone call to affirm that Anick was taking permanent ownership of the pets.

{¶ 12} When Lockhart left the pets with Anick in September 2020, she told him that she did not know how long she would be leaving the pets with him. She testified that she explained to him that "because of my mental health ... it was going to be a very long time until I felt that I was going to be ready to take them back."

4.

{¶ 13} As a part of the transfer, Lockhart gave Anick pet supplies, including treats and toys, as well as vet records, their microchip registrations, and her pet insurance policy. She transferred the documents to Anick's name because she did not know how long the pets would be with him, and she wanted Anick to have everything he needed to take care of them. Lockhart emailed the pet insurance company to request a transfer of the policy to Anick. Her email, which was admitted into evidence, stated that "I'm requesting to transfer over my ownership of the two pets on my account, Mango and Fluffy, to Robert Anick, Jr." Lockhart explained that the only way to transfer the pet insurance policy to Anick was to designate him as the "pet parent" under the account information. She transferred the insurance policy to him in part because she wanted to help him financially with taking care of the pets.

{¶ 14} Lockhart and Anick did not communicate after she left the pets with him other than occasional updates about the pets. Anick never requested that Lockhart come get the pets or communicated that he no longer wanted to have them. Lockhart and Hurlbut visited the pets once, in May 2021, while they were traveling. Anick gave Lockhart the code to his apartment and permitted Lockhart and Hurlbut to visit with the pets while he slept.

{¶ 15} In July 2022, Lockhart sent a text to Anick stating that her mental health had recovered and she was ready to take the pets back. Anick refused to return the pets to Lockhart. His text response to Lockhart stated:

> You must be tripping if you think I'm giving them back. You chose to abandon them and now you think you can just come pick them up like

nothing happened.  No.  Stay away from my home and stay away from these animals.  Stop trying to contact me.

{¶ 16} Throughout her testimony, Lockhart maintained that the arrangement was always temporary, and that Anick knew this was the agreement all along.

### *Testimony of Robert Anick*

{¶ 17} Anick testified that Mango had some behavior issues when he was living with Lockhart.  Mango would have separation anxiety when Lockhart left the home, and he would charge towards the door when she tried to leave. On one occasion Mango ripped Lockhart's nail off.

{¶ 18} According to Anick, Mango's aggression—not Lockhart's mental health— was the reason why Lockhart asked Anick to take Mango in August 2020.  Anick testified about his conversation with Lockhart as follows:

> So I woke up to a voicemail of her saying, hey, [Hulburt] got bit by Mango. I'm at the hospital right now.  I need to talk to you.  We need to get rid of [M]ango.  So after I got the voicemail I called her back.  We talked.  She said, hey, I'm having too many issues with Mango.  I can't take care of him anymore.  I don't want him in my house; I don't want him anymore.  It's either he's going to you or we're taking him to the pound here in San Antonio; we're getting rid of him.

{¶ 19} Initially, Lockhart only asked Anick to take Mango, but later that day she texted him to ask if he would take Fluffy as well.  According to Anick, Lockhart's mental health did not come up in any of their communications that day.  She told Anick that she trusted him to take care of the pets because he had taken good care of them when they lived together.  Anick testified that initially he told Lockhart he needed a minute to think it over, but then he ultimately agreed to take them both.

6.

{¶ 20} After Lockhart left the pets with him on September 7, 2020, Anick believed he was the pets' permanent owner, particularly because of Lockhart's statements at that time. He testified that when Lockhart was dropping the pets off, she said, "You can have them, they are yours, I am done with them." Additionally, he spoke with Lockhart after she dropped the pets off to discuss the arrangement, and she repeated the same sentiment to him. Anick testified about their conversation as follows:

> Once [Lockhart and Hurlbut] left the home, that's when [Lockhart and I] did have that conversation where I said, hey, look, I'm going to look after them. If you guys want to come visit, that's fine. But if you want them back, we're going to have to talk about it and we're going to have to have a conversation . . . [Lockhart] said I am not interested in having them back. There is no future I see with them in my foreseeable future. I do not want them.

{¶ 21} On one or two occasions, Lockhart mailed items for the pets to Anick's house. After Lockhart transferred the policy to Anick, he paid the insurance premiums until Mango's vet recommended that he cancel the policy. Likewise, after Lockhart reregistered the pets' microchips to Anick's ownership, he paid the subscription for the microchips' tracking services. Anick also made medical decisions for the pets—he testified that he had taken Mango to get his teeth cleaned and a tooth pulled, and he took the pets for vet appointments and surgeries—and he paid for their medical care without help from Lockhart. He also registered Mango under his name with the county. Anick testified that he did not request money from Lockhart for expenses because he thought they were his pets, and he explained that he would have asked for reimbursement if he had not believed the pets were his.

7.

**{¶ 22}** Anick let Lockhart and Hurlbut visit the pets once, on May 31, 2021, although he did not interact with them because he was sleeping after working a night shift. Anick explained that he allowed them to enter his home and visit while he was sleeping because he was not concerned that they would try to take the pets when they left.

**{¶ 23}** Regarding the text messages he and Lockhart exchanged when she announced she was going to pick the pets up, Anick testified as follows:

Q: And you're shocked?

A: I'm absolutely, just, what are you talking about.

Q: Okay. Because that's not what you guys ever talked about?

A: No, never talked about it once.

Q: Okay. All right. What else would you like to point out to the magistrate?

A: She didn't make any kind of mention to me ever about any kind of compensation, paying for anything, until the text message ... where she says whatever money you think you deserve, I too think you deserve that from me. I never once asked for compensation because I knew that I was the pet owner. I was the one who was responsible for the payments; I was responsible for the care; I was responsible for everything. I was never offered compensation. I was never offered any kind of help with any kind of billing or anything. Outside of the couple of gift donations of treats and toys, I never heard anything about getting anything from them or for them. And then [in her text message] she said she didn't want any of the reminders because she wasn't ready to accept how terrible she was two years ago. To me, I wasn't giving her updates because I was the owner of the pets. I didn't think I needed to update the previous owner on how the pets were doing.

**{¶ 24}** Anick did not dispute that he refused to return the pets to Lockhart's possession.

8.

*Magistrate's Decision*

{¶ 25} The magistrate issued a decision on January 9, 2024. The magistrate found that Lockhart gifted both Fluffy and Mango to Anick, as follows:

> I find [Anick] credible that the turnover was unconditional, as opposed to [Lockhart]'s stance it was conditional. More to the point, I find by clear and convincing evidence ([Lockhart's email exchange with the insurance company requesting to designate Anick as the pets' owner]) the animals were gifted to the [Anick].

In the conclusions of law, the magistrate addressed Mango and Fluffy separately. Despite finding that Lockhart gifted Mango to Anick, the magistrate concluded that Lockhart remained Mango's owner because Lockhart did not provide Anick with a certificate of transfer pursuant to R.C. 955.11(B). The magistrate reasoned that R.C. 955.11(B), which requires a seller of a dog to provide a certificate of transfer to the dog's buyer, makes any attempt to transfer ownership of a dog without a certificate of transfer ineffective. Because R.C. 955.11(B) does not apply to cats, however, the magistrate concluded that Anick was Fluffy's owner, explaining, "[Lockhart]'s intent was to transfer ownership of the pets to [Anick], deeming it best for all concerned."

*The Parties' Objections and the Trial Court's Order*

{¶ 26} Both parties filed objections to the magistrate's decision. Anick presented three objections for the trial court to consider. First, Anick argued that R.C. 955.11(B) should not be decisive on the issue of dog ownership. Second, Anick asserted that the magistrate should have considered the affirmative defense of abandonment and whether it may overcome R.C. 955.11(B). Lastly, Anick argued that the magistrate should have ordered restitution to Anick for unjust enrichment. Anick requested that the trial court

9.

grant him permanent possession of Fluffy and Mango and order Lockhart to issue a certificate of transfer in compliance with R.C. 955.11(B).

{¶ 27} Lockhart objected to the grant of permanent possession of Fluffy to Anick, but she made no objections to the court's placement of Mango and denial of Anick's request for reimbursement.

{¶ 28} The trial court reviewed and adopted the magistrate's decision, overruling both parties' objections. The court explained that the magistrate correctly applied the law, "as it is," to the facts. Both parties filed a timely appeal from trial court's judgment.

### III. Assignments of Error

{¶ 29} In her appeal, Lockhart asserts two assignments of error:

1. The trial court's finding that Lockhart made a gift of the pets was based on insufficient evidence.

2. The trial court's finding that Lockhart made a gift of the pets was against the manifest weight of the evidence.

{¶ 30} Anick asserts the following assignments of error in his cross-appeal:

1. The overwhelming facts elicited at trial should have overcome the Magistrate's and Judge's utilization of Ohio Revised Code 955.11(B) and *Eltibi v. Kocsis,* 2021-Ohio-2911 (9th Dist.) to determine ownership of the dog, Mango. Anick should have been determined the owner of Mango.

2. Lockhart's abandonment of Mango should have been considered by the Magistrate/Judge and overcome any failure to comply with R.C. 955.11(B), with the result that Anick be determined the owner of Mango.

### IV. Law and Analysis

**A. The trial court did not abuse its discretion in determining that all elements of an inter vivos gift were satisfied.**

10.

{¶ 31} In her two assignments of error, Lockhart argues that the trial court's finding of a completed gift was based on insufficient evidence and was against the manifest weight of the evidence. Because these assignments of error relate to the same factual findings, we will address them together.

{¶ 32} A completed inter vivos gift requires:

> (1) an intention on the part of the donor to transfer the title and right of possession of the particular property to the donee then and there, and (2) in pursuance of such intention, a delivery by the donor to the donee of the subject-matter of the gift to the extent practicable or possible, considering its nature, with relinquishment of ownership, dominion, and control over it.

*Turner v. Turner*, 2023-Ohio-1298, ¶ 19 (6th Dist.), citing *Bolles v. Toledo Tr. Co.*, 132 Ohio St. 21 (1936), paragraph one of the syllabus. To support a claim of a gift, a donee must establish that the record contains clear and convincing evidence of donative intent and delivery. *Studniewski v. Krzyzanowski*, 65 Ohio App.3d 628, 632 (6th Dist. 1989). "'Clear and convincing evidence' is '[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.' " *Ali v. Lucas Cnty. Dog Warden*, 2017-Ohio-2809, ¶ 9 (6th Dist.), quoting *In re Estate of Haynes*, 25 Ohio St.3d 101, 104 (1986).

{¶ 33} Here, Lockhart challenges the trial court's findings that she had present donative intent and that she completed delivery of the pets, arguing that there was insufficient evidence to support the trial court's findings and that the trial court's findings

11.

were against the manifest weight of the evidence. Notably, "the concepts of sufficiency and manifest weight in civil cases are distinct." *In re Z.C.*, 2023-Ohio-4703, ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10. " '[S]ufficiency is a test of adequacy,' while weight of the evidence ' "is not a question of mathematics, but depends on its effect in inducing belief." " *Id.*, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-87 (1997).

{¶ 34} "Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." *Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). "[A] court of appeals should affirm a trial court when " 'the evidence is legally sufficient to support the jury verdict as a matter of law." ' " *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (6th Ed.1990).

{¶ 35} On a manifest-weight challenge to the trial court's adoption of a magistrate's factual findings, the appellate court considers whether the findings were supported by some competent, credible evidence. *Marlowe v. Marlowe*, 2023-Ohio-1417, ¶ 135 (6th Dist.). In addition, "[w]hen reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re Z.C.* at ¶ 14, quoting *Eastley* at

12.

¶ 20. However, the appellate court extends deference to the trial court's factual findings because "the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Accordingly, "[i]f the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment." *In re Z.C.* at ¶ 14, quoting *Seasons Coal* at fn. 3.

### 1. Present donative intent

{¶ 36} For an inter vivos gift to be valid, the donor must intend to transfer ownership in the present, not in the future. "Donative intent is established if a transferor intends to transfer a present possessory interest in an asset." *Cook v. Cook*, 2019-Ohio-1961, ¶ 44 (5th Dist.), quoting *Brate v. Hurt*, 2007-Ohio-6571, ¶ 21 (12th Dist.). "A inter vivos has no reference to the future, but goes into immediate and absolute effect." *Bolles*, 132 Ohio St. at 27 (1936). Accordingly, transfer of possessory interest must not be intended to take place in the future. *See Cook* at ¶ 44; *Turner*, 2023-Ohio-1298, at ¶ 19; *Bolles* at 27 (a valid gift takes place in the present and has no reference to the future).

{¶ 37} A party may establish that the donor intended to transfer possessory interest in a variety of ways, and although a single piece of evidence individually may be insufficient to clearly and convincingly establish a donor's intent, a court may consider all of the evidence as a whole to determine whether a putative donor had the requisite intent. *See, e.g., Picciano v. Picciano*, 2021-Ohio-4603, ¶ 53 (5th Dist.) (explaining that

13.

various parts of party's testimony, "taken together, demonstrate [the party] possessed the requisite donative intent"). For example, possession of documents pertaining to ownership of a dog may represent "'some indicia' of the parties' intent regarding ownership." *Dukuzumuremyi v. Martin*, 2025-Ohio-508, ¶ 30 (11th Dist.). In addition, "[t]his court has previously recognized that a person's statement of donative intent at the time of delivery of personal property to a claimed donee is a statement indicative of a then-existing state of mind or intent and admissible under Evid.R. 803(3)." *Richards v. Wasylyshyn*, 2012-Ohio-3733, ¶ 22 (6th Dist.).

{¶ 38} Here, the record contains sufficient evidence, taken together, to support the trial court's finding that Lockhart intended to transfer her ownership interest in the pets to Anick. First, all three witnesses testified that Lockhart physically transferred the pets to Anick's residence, where they lived for the next nearly two years.

{¶ 39} Next, it is undisputed that Lockhart transferred several pet ownership items to Anick, including the microchip registration and vet records. The email exchange between Lockhart and the insurance provider in which Lockhart made Anick the "pet parent"—and thus the pets' owner pursuant to the insurance policy terms—particularly indicates Lockhart's intention to transfer ownership to Anick. Lockhart argues that her identification of Anick as the "pet parent" on the pet insurance policy should not be dispositive of a pet's ownership because a pet parent could also be the pet owner's spouse or partner. However, there is no dispute that Anick was not Lockhart's spouse or partner when she informed the insurer that Anick was the new pet parent, and she has not

14.

identified any way, other than making Anick the pets' owner, in which she could have made Anick the "pet parent" under the policy. If Lockhart had not truly intended to give Anick the pets, then the transfer of the insurance policy—which could only be held by the pets' owner—would have been fraudulent and invalid.

{¶ 40} Statements made by Lockhart at the time of transferring possession are also indicative of her intent for Anick to take immediate ownership. Anick testified that when Lockhart gave him the pets, she said, "I am not interested in having them back. There is no future I see with them in my foreseeable future. I do not want them." Lockhart's words are consistent with an intent for Anick to take ownership as well as possession of the pets as soon as Lockhart left them with him.

{¶ 41} Next, the trial court's finding of present donative intent was not against the manifest weight of the evidence. Lockhart points out that she maintained throughout her testimony that she merely intended to give Anick temporary custody of the pets, contradicting Anick's testimony that she told him she was uninterested in having them back, and Lockhart's partner, Hurlbut, corroborated Lockhart's testimony regarding Lockhart's intentions. However, the trier of fact was in the best position to weigh the credibility of the witnesses and to resolve any inconsistencies in their testimony. Moreover, the trial court's credibility determination was bolstered by Lockhart's email to the pet insurer in which she expressly identified Anick as the pets' new owner.

15.

{¶ 42} Accordingly, the trial court's finding that Lockhart intended to transfer ownership of the pets to Anick was supported by sufficient evidence and was not against the manifest weight of the evidence.

**2. Delivery**

{¶ 43} When possible, delivery of a gift must be satisfied by direct physical delivery. "To render the gift complete, there must be an actual delivery of the chattel, so far as the subject is capable of such a delivery, and without such a delivery the title does not pass. If the subject be not capable of actual delivery, there must be some act equivalent to it." *Bolles,* 132 Ohio St. at 27.

{¶ 44} Physical possession alone does not satisfy delivery; the donor must also have delivered ownership of the gift by voluntarily giving up control of the property.

> The delivery requirement is fundamentally about relinquishing ownership and control. Delivery is important because it manifests a transfer of legal title. Perhaps the best evidence (the most specific and definite) of delivery is actual physical delivery of the thing given (e.g., handing over a book, given as a gift). While such evidence alone is not dispositive, it strongly suggests that a gift was made.

*Algren v. Algren*, 2009-Ohio-3009, ¶ 19 (2d Dist.) (internal citations omitted).

{¶ 45} Here, Lockhart admits she transferred possession of the pets to Anick. However, Lockhart contests that she delivered ownership of the pets, arguing that the trial court's finding that she relinquished her ownership, dominion, and control of them was not supported by sufficient evidence and was against the manifest weight of the evidence.

{¶ 46} To the contrary, the trial court's finding that Lockhart relinquished ownership was supported by sufficient evidence. Lockhart transferred to Anick all

16.

resources that a pet's owner would have. She changed the owner information on Fluffy and Mango's microchips, which once identified Lockhart as their owner, to Anick's contact information. Significantly, Lockhart identified Anick as the pets' owner on the pet insurance policy. Lockhart gave Anick the pets' vet records as well. Additionally, Anick, rather than Lockhart, registered Mango with the county where he lived.

{¶ 47} The record also contains sufficient evidence to support the conclusion that Lockhart forfeited her control and dominion over the pets. Lockhart was no longer listed under their microchip location, and thus if the pets had ever run away, she would not have been contacted about their whereabouts. She was not registered as Mango's owner in any county. Lockhart had to gain permission from Anick to see the pets at Anick's house in May 2021, and she did not take the pets with her when the visit was over. Anick made the medical decisions for the pets after they were left with him.

{¶ 48} Likewise, the trial court's finding was not against the manifest weight of the evidence. Again, although Lockhart testified that she was clear with Anick that he only had temporary custody of the pets, where the evidence is susceptible to two possible resolutions, we defer to the trier of fact's credibility determinations.

{¶ 49} The trial court's finding that Lockhart gifted Mango and Fluffy to Anick was supported by sufficient evidence and was not against the weight of the evidence. Lockhart's first and second assignments of error are not well-taken.

**B. The trial court erred in finding noncompliance with R.C. 955.11(B) made the transfer of ownership of Mango ineffective.**

{¶ 50} In support of his first assignment of error, Anick argues that the trial court erred in finding a certificate of transfer was necessary to transfer legal ownership of Mango, contending that the trial court incorrectly interpreted R.C. 955.11(B). Trial courts do not have discretion to misapply the law. *J.P. v. State,* 2024-Ohio-5781, ¶ 17 (11th Dist.), citing *Johnson v. Abdullah,* 2021-Ohio-3304, ¶ 38-39. Because Anick's assignment of error requires us to determine if the trial court misapplied R.C. 955.11(B) to the facts of this case, our standard of review is as follows:

> [A]n appellate court exercises plenary review over questions of law, including questions of statutory interpretation . . . When exercising plenary review over a question of statutory interpretation we review using a de novo standard. When reviewing a matter de novo, this court gives no deference to the trial court's decision.

*Reusch v. City of Toledo*, 2020-Ohio-3066, ¶ 10-11 (6th Dist.) (internal citations omitted).

### 1. Case Law Interpreting R.C. 955.11(B)

{¶ 51} In this case, despite finding a valid gift of both pets, the trial court found as a matter of law that Lockhart was entitled to replevin of Mango because when Lockhart transferred possession of the pets to Anick, she failed to issue Anick a certificate in compliance with R.C.955.11(B). Anick challenges the trial court's conclusion that a certificate of transfer consistent with R.C. 955.11(B) was necessary to gift Mango.

{¶ 52} R.C. 955.11(B) provides as follows:

> Upon the transfer of ownership of any dog, the seller of the dog shall give the buyer a transfer of ownership certificate that shall be signed by the Seller. The certificate shall contain the registration number of the dog, the name of the seller, and a brief description of the dog. Blank forms of the

18.

certificate may be obtained from the county auditor. A transfer of ownership shall be recorded by the auditor upon presentation of a transfer of ownership certificate that is signed by the former owner of a dog and that is accompanied by a fee of five dollars.

{¶ 53} Despite its finding of a donative transaction, the trial court held that R.C. 955.11(B)'s mandatory language negated Anick's ownership of Mango. The court pointed to the plain language of the statute, which states that the "the seller of the dog *shall* give the buyer a transfer of ownership certificate." R.C. 955.11(B) (Emphasis added.). The trial court reasoned that because the statute used mandatory language—the word "shall"—and Anick could not produce a transfer of ownership certificate, Lockhart's attempt to transfer ownership of Mango as a gift was ineffective.

{¶ 54} Few Ohio courts have interpreted R.C. 955.11(B) in considering whether a transfer of ownership certificate is a necessary element to establish the effective transfer of a dog or merely a factor to consider in determining the dog's ownership. Lockhart relies on *Eltibi v. Kocsis,* 2021-Ohio-2911 (9th Dist.) in arguing that R.C.955.11(B) is an element of transferring ownership, not merely a factor. *Eltibi* also involved a dispute over the ownership of a dog between parties who were former romantic partners. In that case, the appellant and the appellee went together to get a dog from a humane society. *Id*. at ¶ 2. The appellant was the only party to fill out and sign the adoption contract with the humane society. *Id*. Eventually, the appellee and appellant separated but shared custody of the dog until the appellee refused to return the dog to the appellant. *Id*. at ¶ 3. The trial court considered evidence presented by the appellee such as receipts for items she spent on the dog's care and her registration of the dog with the county before concluding both

19.

parties had equal ownership of the dog. *Id.* at ¶ 5-6, 9. However, the Ninth District Court of Appeals reversed the trial court's ruling because the appellee did not produce a certificate in compliance with R.C. 955.11(B), whereas the appellant did have an adoption contract from the humane society that did fit the necessary requirements of R.C. 955.11(B). *Id.* at ¶ 18.

{¶ 55} This court also relied on a certificate of transfer under R.C. 955.11(B) to determine a dog's ownership in *Lucas Cty. Pit Crew v. Fulton Cty. Dog Warden*, 2016-Ohio-8526 (6th Dist.). In that case, which involved a challenge to the designation of a dog as dangerous, we determined that a dog's ownership was transferred upon the date that the dog's former owner signed a certificate of transfer under R.C. 955.11(B), even though the dog's new owner obtained possession of the dog approximately two weeks earlier. *Id.* at ¶ 5, 8, 14. Notably, in that case, unlike the present case, there was no dispute that the transfer of ownership occurred, the only question was the timing of the transfer, and the dog's former owner executed a certificate of transfer. *Id.* at ¶ 8.

{¶ 56} In contrast, Anick cites *Butera v. Beesler,* 2023-Ohio-2257 (11th Dist.) in support of his argument that compliance with R.C.955.11(B) is only a factor in establishing ownership, not determinative. In *Butera,* the Eleventh District held that the existence of a transfer of ownership certificate under R.C. 955.11(B) is just one factor a court may consider in determining dog ownership. *Id.* Significantly, the court noted that R.C. 955.11(B), "does not specify that creation of the certificate effectuates the transfer of ownership." *Id.* at ¶ 29. In reaching its holding, the Eleventh District cited cases in

20.

which courts determined a dog's ownership based on factors such as registration, statements of donative intent at the time of transfer, or where a dog resides, never mentioning R.C. 955.11(B). *Id.* at ¶ 32. Following its holding in *Butera,* the Eleventh District again held that a party may prove ownership of a dog even without a completed transfer of ownership certificate in compliance with R.C.955.11(B). *Dukuzumuremyi,* 2025-Ohio-508, at ¶ 16.

{¶ 57} We find the Eleventh District's reasoning in *Butera* and *Dukuzumuremyi* more persuasive than the Ninth District's reasoning in *Eltibi*. Moreover, we note that *Lucas County Pit Crew* is distinguishable from this case, as Lockhart did not execute a certificate of transfer.

## 2. Applying Principles of Statutory Interpretation to R.C. 955.11(B)

{¶ 58} When interpreting a statute, we strictly follow the plain meaning of the language if it is unambiguous. "It is a court's responsibility to enforce the literal language of a statute wherever possible; to interpret, not legislate. Unless a statute is ambiguous, the court must give effect to its plain meaning." *State Bureau of Workers' Comp. v. Dernier,* 2011-Ohio-150, ¶ 26 (6th Dist.). *See also Mack v. City of Toledo*, 2019-Ohio-5427, ¶ 48 (6th Dist.). "Ambiguity exists only if the language of a statute is susceptible of more than one reasonable interpretation, and the facts and circumstances of a case do not permit a court to read ambiguity into a statute." *Olentangy Local School Dist. Bd. of Education v. Delaware Cty. Bd. of Revision*, 2024-Ohio-2442, ¶ 26 (5th Dist.). When the language of a statute is ambiguous, then courts apply rules of

21.

construction. "[W]here a statute is found to be subject to various interpretations, a court called upon to interpret its provisions may invoke rules of statutory construction in order to arrive at legislative intent." *State v. Frost,* 2019-Ohio-3540, ¶ 35 (12th Dist.), quoting *State v. Waggoner*, 2013-Ohio-5204, ¶ 9 (12th Dist.), quoting *Cline v. Ohio Bur. of Motor Vehicles*, 61 Ohio St.3d 93, 96 (1991).

{¶ 59} Indeed, "[t]he primary rule in statutory construction is to give effect to the legislature's intention." *State ex rel. Clay v. Cuyahoga Cty. Med. Examiner's Office*, 2017-Ohio-8714, ¶ 15 (internal citations omitted). "The intention of the legislature is to be collected from the words they employ." *Bd. of Trustees Wood Cnty. Property Tr. Agreement, UAD June 4, 2008 John F. Nixon, Chairman v. Melcher*, 2025-Ohio-1000, ¶ 14 (6th Dist.), quoting *State v. Fork*, 2024-Ohio-1016, ¶ 13, quoting *United States v. Wiltberger*, 18 U.S. 76, 95 (1820). To decipher legislative intent, courts must read the language of the statute in context and to "construe related sections together." *Spencer v. Freight Handlers, Inc.*, 2012-Ohio-880, ¶ 16. However, even in determining legislative intent, courts have "'no authority under any rule of statutory construction to add to, enlarge, supply, expand, extend or improve' a statute." *Avaya Inc. v. Ohio Dept. of Commerce, Div. of Unclaimed Funds*, 2021-Ohio-4626, ¶ 17 (10th Dist.), quoting *Ohio Podiatric Med. Assn. v. Taylor*, 2012-Ohio-2732, ¶ 22 (10th Dist.).

{¶ 60} As the trial court correctly observed, the plain language of R.C. 955.11(B) does contain mandatory language because the statute uses the word shall. However, the trial court's analysis of R.C. 955.11(B) overlooks other key terms in the statute's plain

22.

language. R.C. 955.11(B) makes it mandatory for a *seller* to give a certificate of transfer to a *buyer*. Although R.C. 955.11(B) does not define "buyer" or "seller," we may ascertain their meaning using their dictionary definitions. *See Fickle v. Conversion Technologies Internatl., Inc.*, 2011-Ohio-2960, ¶ 29 (6th Dist.) (*"the plain, ordinary, or generally accepted meaning of an undefined statutory term is invariably ascertained by resort to common dictionary definitions."*). Merriam-Webster defines a seller "one that offers for sale." A buyer is defined as "one who buys something." The statute's plain language, therefore, limits its application to sales transactions, not donative transactions. Because the transfer at issue here is a gift, not a sale, and Lockhart was a donor, not a seller, Lockhart was not required to provide a transfer of ownership certificate to Anick under R.C. 955.11(B)'s plain language.

{¶ 61} Even if R.C. 955.11(B) did apply to the transaction at issue, we cannot interpret R.C. 955.11(B) to have required Lockhart to give Anick a certificate to make the transfer of Mango effective. "[C]ourts are forbidden to add a nonexistent provision to the plain language of legislation." *State ex rel. Tjaden v. Geauga Cty. Bd. of Elections*, 2024-Ohio-3396, ¶ 39, quoting *State ex rel. Whitehead v. Sandusky Cty. Bd. of Commrs.*, 2012-Ohio-4837, ¶ 31. Although R.C. 955.11(B) requires a seller to provide a certificate to a dog's buyer, it contains no language whatsoever to indicate that a sale is ineffective without the certificate. In contrast, the Ohio General Assembly has expressly conditioned the transfer of ownership of boats as well as motor vehicles on the transferee's obtaining a certificate of title from the transferor. *See* R.C. 1548.03 ("[N]or shall any person

23.

purchase or otherwise acquire a watercraft or outboard motor without obtaining a certificate of title for it"); R.C. 4505.03 ("[N]or shall any person … buy or otherwise acquire a motor vehicle without obtaining a certificate of title for it"). Accordingly, we cannot add any such provision to the statute's plain language.

{¶ 62} After applying the plain language of R.C. 955.11(B), we conclude that Lockhart's failure to give Anick a certificate of transfer of ownership had no effect on her gift of Mango to Anick. The statute does not apply to Lockhart's gift of Mango to Anick because the plain language of R.C. 955.11(B) applies to a sales transaction, not a donative transaction. Most importantly, R.C. 955.11(B) contains no provision that limits the effectiveness of a transfer of a dog's ownership to only those transactions in which a transferor provides a certificate of transfer to the transferee. Instead, as the court held in *Butera*, whether a transferor gave the transferee a certificate of transfer is merely evidence, not a requirement, of the transfer of a dog's ownership. 2023-Ohio-2257 at ¶ 33. Accordingly, the trial court erred in finding that Anick's could not be Mango's owner due to a lack of a certificate of transfer in compliance with R.C. 955.11(B). Anick's first assignment of error is well-taken.

{¶ 63} Based on our resolution of Lockhart's assignments of error and Anick's first assignment of error, Anick's second assignment of error contending that Lockhart abandoned Fluffy and Mango is rendered moot.

## V. Conclusion

{¶ 64} Because we conclude that the trial court's finding that Lockhart's gift of Mango and Fluffy to Anick was supported by sufficient evidence and was not against the

24.

manifest weight of the evidence, but the trial court's application of R.C. 955.11(B) to invalidate Lockhart's gift of Mango was an error of law, we hold that the trial court properly awarded Fluffy to Anick and erred in awarding Mango to Lockhart. Accordingly, the judgment of the Toledo Municipal Court is affirmed in part and reversed in part, and this case is remanded for proceedings consistent with this opinion.

{¶ 65} Lockhart is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed, in part,
reversed, in part, and remanded.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Thomas J. Osowik, J.

Gene A. Zmuda, J.

Charles E. Sulek, P.J.
CONCUR.

_____
JUDGE

_____
JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.